**Senator Barry GOLDWATER et al.**

v.

**James Earl CARTER, President of the United States et al., Appellants.**

**No. 79-2246.**

United States Court of Appeals, District of Columbia Circuit.

Argued en banc Nov. 13, 1979.

Decided Nov. 30, 1979.

As Amended Dec. 5, 1979.

Judgment Vacated Dec. 13, 1979. See 100 S.Ct. 533.

John M. Harmon, Asst. Atty. Gen., Washington, D. C., a member of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, with whom Carl S. Rauh, U. S. Atty., and Robert E. Kopp, William Kanter, Michael F. Hertz, and Linda M. Cole, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellants.

Paul D. Kamenar and Northcutt Ely, Washington, D. C., with whom Daniel J. Popeo, Robert F. Pietrowski, Jr., and Ralph J. Gillis, Washington, D. C., were on brief, for appellees.

Charles N. Brower, Washington, D. C., with whom Paul L. Friedman, Washington, D. C., was on brief, for amici curiae International Law Institute of the Georgetown University Law Center et al., urging reversal and dismissal of the complaint.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, LEVENTHAL *, ROBINSON, MacKINNON, WILKEY and WALD, Circuit Judges.

* Circuit Judge Leventhal participated in the consideration of this case but died before the decision and judgment were announced.

Opinion for the court PER CURIAM.

Opinion concurring in the result, in which Circuit Judge TAMM joins, filed by Chief Judge WRIGHT.

Opinion dissenting in part and concurring in part filed by Circuit Judge MacKINNON.

PER CURIAM:

The court *en banc* has before it for review the judgment of the District Court that the notice of termination given by the President pursuant to the terms of the Mutual Defense Treaty with the Republic of China is ineffective absent either (1) a manifestation of the consent of the Senate to such termination by a two-thirds vote or (2) an approving majority vote therefor by both houses of Congress. The preliminary questions we confront are, first, whether the District Court was without jurisdiction because appellees lacked standing, and, second, whether it should in any event have declined to exercise jurisdiction by reason of the political nature of the question it was called upon to decide. Since a majority of the court does not exist to dispose of the appeal on either of these bases,[1] we reach the merits and reverse.[2]

In doing so, however, we think it important at the outset to stress that the Treaty, as it was presented to the Senate in 1954 and consented to by it, contained an explicit provision for termination by either party on one year's notice. The Senate, in the course of giving its consent, exhibited no purpose and took no action to reserve a role for itself—by amendment, reservation, or condition—in the effectuation of this provision. Neither has the Senate, since the giving of the notice of termination, purported to take any final or decisive action with respect to it, either by way of approval or disapproval. The constitutional issue we face, therefore, is solely and simply the one of whether the President in these precise circumstances is, on behalf of the United States, empowered to terminate the Treaty in accordance with its terms. It is our view that he is, and that the limitations which the District Court purported to place on his action in this regard have no foundation in the Constitution.

---

*BACKGROUND*

In the aftermath of the Chinese Revolution and the Korean War, the United States and the Republic of China (ROC) negotiated a Mutual Defense Treaty, primarily directed against the perceived threat from the People's Republic of China (PRC). The Treaty was signed by representatives of both nations on December 2, 1954. It was approved by the Senate, and finally signed by the President on February 11, 1955. Article V of the Treaty provided that, in the

---

1. In a separate concurring opinion, Judges Wright and Tamm have limited their consideration to the question of standing; and, finding that none exists, vote to reverse the District Court. There are no votes to reverse founded upon the political question doctrine.

2. *Amici* in this court cast their argument in terms of a mootness disposition which assertedly would make it unnecessary to decide whether the President could, without congressional participation, terminate the Treaty by giving notice in accordance with its terms. They submit that the President's action in recognizing the People's Republic of China and in withdrawing recognition of the Republic of China, arising out of changed circumstances, of its own force under international law brought an end to the Mutual Defense Treaty between the latter and the United States. This end, so it is said, occurred automatically, and thus there is no necessity for the court to rule upon the

validity of the notice of termination which in substance had no meaning or effect.

Without intimating any view on the accuracy of the *amici*'s premises, we do not pursue the mootness claim for the reason that the President did not purport to rely on international law as a possible defense against any future claim that the Treaty was a continuing obligation of the United States despite the events enumerated by the *amici*. Instead, the President elected to assert, on behalf of the United States, the privilege of terminating the Treaty by appropriate notice as provided by its own terms. A proper functioning of such a mutual termination clause is to permit a party to a treaty to respond to a change in circumstances without becoming embroiled in disputes as to the reach of international law doctrines. As we hold hereinafter, this course of action was, on the facts in this record, within the constitutional authority of the President.

event of an attack on Taiwan, the Pescadores, or United States territories in the western Pacific, each nation "would act to meet the common danger in accordance with its constitutional processes." Article X of the Treaty provided that it would remain in force "indefinitely," but said that "[e]ither Party may terminate it one year after notice has been given to the other Party."

At that time both the ROC and PRC claimed—and still claim—to be the sole legitimate government of China; both considered Taiwan a part of China. Since then over 100 nations, including all of our NATO allies and Japan, have officially recognized the PRC as the sole government of China, breaking off relations with Taiwan. In 1971 the United Nations admitted delegates from the PRC to the seats reserved for China in the General Assembly and Security Council, and expelled those from the ROC.

In the early 1970's the United States began to pursue a policy of closer relations with the PRC. The early stage of this effort culminated in President Nixon's visit to the mainland of China, during which the two nations released the "Shanghai Communique," declaring the goal of "normalization of relations between China and the United States." The PRC stipulated that full mutual diplomatic recognition was preconditioned on United States agreement to cease all diplomatic and other official relations with the ROC, to withdraw United States military units from Taiwan, and to terminate the Mutual Defense Treaty with the ROC.

In September 1978 Congress passed and the President signed the International Security Assistance Act of 1978, Pub.L.No.95–384, 92 Stat. 746. Section 26 of that Act,

called the "Dole-Stone Amendment," provided:

It is the sense of the Congress that there should be prior consultation between the Congress and the executive branch on any proposed policy changes affecting the continuation in force of the Mutual Defense Treaty of 1954.

On December 15, 1978 President Carter announced that the United States would recognize the PRC as the sole government of China, effective January 1, 1979, and would simultaneously withdraw recognition from the ROC. In addition, the United States announced that the ROC would be notified that "the Mutual Defense Treaty is being terminated in accordance with the provisions of the Treaty." On December 23, 1978 the State Department formally notified the ROC that the Treaty would terminate on January 1, 1980.

While severing all official ties with the ROC, the United States has sought to preserve "extensive, close, and friendly commercial, cultural, and other relations between the people of the United States and the people on Taiwan."[3] The Taiwan Relations Act, Pub.L.No.96–8, 93 Stat. 14, signed into law on April 10, 1979, established the statutory framework for such relations.[4] It provided:

For all purposes, including actions in any court in the United States, the Congress approves the continuation in force of all treaties and other international agreements, including multilateral conventions, entered into by the United States and the governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and

---

**3.** Taiwan Relations Act, Pub.L.No.96–8, 93 Stat. 14, § 2(b)(1) (April 10, 1979). Relations between the United States Government and the authorities on Taiwan are conducted through a nonprofit corporation, the American Institute in Taiwan. *Id.* § 6.

**4.** Section 3 of the Act authorizes the United States to provide defense material to Taiwan, and says that "[t]he President and the Congress shall determine the nature and quantity of such defense articles and services based

solely upon their judgment of the needs of Taiwan." It further directs the President to report to the Congress on "any threat to the security or the social or economic system of the people on Taiwan and any danger to the interests of the United States arising therefrom." The President and the Congress then "shall determine * * * appropriate action by the United States in response to any such danger." *Id.* § 3.

in force between them on December 31, 1978, unless and until terminated in accordance with law.

*Id.* § 4(c).

On December 22, 1978 plaintiffs-appellees filed this suit in District Court, seeking declaratory and injunctive relief to prevent termination of the Treaty without senatorial or congressional consent. The complaint alleged that the President violated his sworn duty to uphold the laws, including the treaties, of the United States. It asserted that the President has no unilateral power under the Constitution to abrogate treaties, and that the United States, not the President, is the party invested by Article X of the Treaty with the power of termination.

On June 6, 1979 the District Court dismissed the suit, without prejudice, for lack of standing. The court observed that three resolutions then pending in the Senate might resolve the controversy without need for judicial intervention.[5] The court concluded:

> If the Congress approves the President's action, the issue presently before the Court would be moot. If the Senate or the Congress takes action, the result of which falls short of approving the President's termination effort, then the controversy will be ripe for a judicial declaration. . . .

JA 631–632.

Within hours of the District Court order the Senate called up Senate Resolution 15 which, as amended by the Foreign Relations Committee, would have recognized some fourteen grounds that would justify unilateral action by the President to terminate

treaty obligations of the United States.[6] By a vote of 59 to 35 the Senate substituted for its consideration an amendment drafted by Senator Harry Byrd, Jr.:

> That it is the sense of the Senate that approval of the United States Senate is required to terminate any mutual defense treaty between the United States and another nation.

125 Cong.Rec. S7015, S7038–S7039 (daily ed. June 6, 1979). Later that day, during the course of debate on the amended resolution, a dispute arose among the Senators over whether the resolution would have retrospective, or merely prospective effect. No final vote was ever taken on the resolution, and the Majority Leader returned the resolution to the calendar.[7]

On June 12, 1979, after the Byrd amendment was voted on, the plaintiffs-appellees filed a motion in District Court for alteration or amendment of the June 6 order of dismissal. They contended that the Senate's action on the Byrd amendment satisfied the court's stated criteria for creating a justiciable controversy. On October 17, 1979 the District Court granted this motion, ruling that the plaintiffs had suffered the requisite injury in fact because of the denial of their right to be consulted and to vote on treaty termination. The court also ruled that the case did not present a nonjusticiable political question. Reaching the constitutional question, the court granted plaintiffs' cross-motion for summary judgment. This appeal followed.

**I**

For purposes of the standing issue, we accept, as we must, appellees' pleaded theo-

---

**5.** Only one of the resolutions, Senate Resolution 15, introduced by Senator Harry Byrd, Jr., reached the floor of the Senate. *See also* S.Res. 10, 125 Con.Rec. S209 (daily ed. Jan. 15, 1979) (introduced by Senator Dole); S.Con. Res. 22, *id.* at S219 (daily ed. Jan. 18, 1979) (introduced by Senator Goldwater).

**6.** Among other grounds, the Committee version would have recognized the right of the Presi-

dent to terminate treaties containing termination clauses like Article X of the 1954 Treaty.

**7.** After oral argument was heard in this court, the Senate debated the resolution, but again took no action. 125 Cong.Rec. S16683–S16692 (daily ed. Nov. 15, 1979). As explained by Senate Parlimentarian Murray Zweben, no final action has been taken on Senate Resolution

ries as valid.[8] A majority of the court is of the view that, at least as their principal theory has evolved—that the Senate has a constitutional right to vote on the President's proposed treaty termination and to block such termination with a one-third plus one vote—the appellee Senators have standing.

If there is merit to their allegations, such Senators have suffered injury in fact from the President's action terminating the Treaty without Senate consent. This action has deprived the Senate of the opportunity—which appellees assert to be constitutionally prescribed—to vote whether to prevent the termination of this treaty. By excluding the Senate from the treaty termination process, the President has deprived each individual Senator of his alleged right to cast a vote that will have binding effect on whether the Treaty can be terminated. The President has thus nullified the right that each appellee Senator claims under the Constitution to be able to block the termination of this treaty by voting, in conjunction with one-third of his colleagues, against it.

■ In our decisions on congressional standing this court has carefully drawn a distinction between (1) a diminution in congressional influence resulting from an Executive action that nullifies a specific congressional vote or opportunity to vote, in an objectively verifiable manner—which, we have found, constitutes injury in fact;[9] and (2) a diminution in a legislator's effectiveness, subjectively judged by him or her, resulting from Executive action withholding information or failing to obey a statute enacted through the legislator's vote, where the plaintiff-legislator still has power to act through the legislative process to remedy the alleged abuses—in which situations we do not find injury in fact.[10] To be cognizable for standing purposes, the alleged diminution in congressional influence must amount to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity; and the plaintiff must point to an objective standard in the Constitution, statutes or congressional house rules, by which disenfranchisement can be shown.[11]

■ In the present case, appellees plead an objective standard in the Constitution as giving them a right to vote on treaty termination. They further allege disenfranchisement in the context of a specific measure, i.e., the proposed termination of the Mutual Defense Treaty. Whether the President's action amounts to a complete disenfranchisement depends on whether appellees have left to them any legislative means to vote in the way they claim is their right. In other words, do they have effective power to block the termination of this treaty despite the President's action? This is the crucial issue, and the focus of our disagreement with the concurring opinion.[12]

15, and the Senate "may or may not return to its consideration in the future." JA 659.

**8.** See *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**9.** See *Harrington v. Bush*, 180 U.S.App.D.C. 45, 66–67, 553 F.2d 190, 211–12 (1977); *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 197–98, 511 F.2d 430, 435–36 (1974).

**10.** See *Reuss v. Balles*, 189 U.S.App.D.C. 303, 309–310, 584 F.2d 461, 467–68 & n.20, *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 43–44, 553 F.2d 176, 188–89 (1977); *Harrington v. Bush*, 180 U.S.App.D.C. 45, 54 n.41, 553 F.2d 190, 199 n.41, 211–14 (1977).

**11.** See *Harrington v. Bush*, 180 U.S.App.D.C. 45, 67, 553 F.2d 190, 212 (1977).

**12.** In his concurrence, 199 U.S.App.D.C. at ——, 617 F.2d at 710–711, Chief Judge Wright also attempts to limit congressional standing to nullification of past votes, citing *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974). Nothing in *Kennedy v. Sampson*, nor in the logic of what constitutes injury in fact, justifies such a limitation. On the contrary, a claim of nullification of past vote alone—based, for instance, on the Executive's failure to obey a validly enacted statute—gives a legislator no better grounds for standing than any other citizen. Courts have properly denied standing to legislators in such situations. "Once a bill has become law, however, their interest is indistinguishable from that of any other citizen." *Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975). See *Harrington v. Bush*, 180 U.S.App.D.C. 45, 68–69, 553 F.2d 190, 213–14 (1977).

The crucial fact is that, on the record before us, there is no conceivable senatorial action that could likely prevent termination of the Treaty. A congressional resolution or statute might at most have persuasive effect with the President; it could not block termination if he persisted in his present interpretation of the Constitution giving him unilateral power to terminate. That appellee Senators have no power to enact a remedy is especially clear in light of the nature of their constitutional claim. They claim the right to block termination with only one-third plus one of their colleagues. There is no way that such a minority can even force a resolution to the floor, let alone pass it. To pretend that effective remedies are open to appellees is to ignore that, first, their alleged right would enable them to block termination with a minority, and, second, that even if they could muster a majority, any legislative action they might take under the present circumstances could well be futile.[13] The only way the Senate can effectively vote on a treaty termination, with the burden on termination proponents to secure a two-thirds majority, is for the President to submit the proposed treaty termination to the Senate as he would a proposed treaty. This is the concrete remedy appellees seek. For the court to require of them some other legislative action before allowing them standing to pursue this claim would be to require a useless act.

Since the President has not afforded an opportunity for an up-or-down vote as appellees request, we do not know whether the Senate would actually block the President's action if given the opportunity. Yet courts consistently vindicate the right to vote without first demanding that the votes when cast will achieve their intended end. A live controversy exists in appellees' claim of an opportunity to cast a binding vote. The President's action has deprived them of this opportunity completely, in the sense that they have no legislative power to exercise an equivalent voting opportunity. Therefore, appellee Senators have standing.

## II

Various considerations enter into our determination that the President's notice of termination will be effective on January 1, 1980. The result we reach draws upon their totality, but in listing them hereinafter we neither assign them hierarchical values nor imply that any one factor or combination of factors is determinative.

1. We turn first to the argument, embraced by the District Court, drawn from the language of Article II, § 2, of the Constitution.[14] It is that, since the President clearly cannot enter into a treaty without the consent of the Senate, the inference is inescapable that he must in all circumstances seek the same senatorial consent to terminate that treaty. As a matter of language alone, however, the same inference would appear automatically to obtain with respect to the termination by the President of officers appointed by him under the same clause of the Constitution and subject to Senate confirmation. But the Supreme Court has read that clause as not having such an inevitable effect in any and all circumstances. *Compare Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) *with In re Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). In the area of foreign relations in particular, where the constitutional commitment of powers to the President is notably comprehensive, it has never been suggested that the services of Ambas-

---

**13.** At oral argument counsel for the appellants admitted this second point. He stated, in the words that follow, that even if the Taiwan Relations Act applied to the Taiwan treaty, that would not override the President's constitutional power to break the Treaty: "Congress could not end that power by passing a law, and the President could not waive it by signing a law."

**14.** The President's powers are there stated in the following terms:

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls . . . . .

sadors—appointed by the President, confirmed by the Senate, and of critical importance as they are to the successful conduct of our foreign relations—may not be terminated by the President without the prior authorization of that body.

Expansion of the language of the Constitution by sequential linguistic projection is a tricky business at best. Virtually all constitutional principles have unique elements and can be distinguished from one another. As the Supreme Court has recognized with respect to the clause in question, it is not abstract logic or sterile symmetry that controls, but a sensible and realistic ascertainment of the meaning of the Constitution in the context of the specific action taken.

2. The District Court's declaration, in the alternative, that the necessary authority in this instance may be granted by a majority of each house of Congress presumably has its source in the Supremacy Clause of Article VI.[15] The argument is that a treaty, being a part of the "supreme Law of the Land," can only be terminated at the least by a subsequent federal statute.

The central purpose of the Supremacy Clause has been accepted to be that of causing each of the designated supreme laws—Constitution, statute, and treaty—to prevail, for purposes of domestic law, over state law in any form. Article VI speaks explicitly to the judges to assure that this is so. But these three types of supreme law are not necessarily the same in their other characteristics, any more than are the circumstances and terms of their creation the same. Certainly the Constitution is silent on the matter of treaty termination. And the fact that it speaks to the common characteristic of supremacy over state law does not provide any basis for concluding that a treaty must be unmade either by (1) the same process by which it was made, or (2)

the alternative means by which a statute is made or terminated.

3. The constitutional institution of advice and consent of the Senate, provided two-thirds of the Senators concur, is a special and extraordinary condition of the exercise by the President of certain specified powers under Article II. It is not lightly to be extended in instances not set forth in the Constitution. Such an extension by implication is not proper unless that implication is unmistakably clear.

The District Court's absolutist extension of this limitation to termination of treaties, irrespective of the particular circumstances involved, is not sound. The making of a treaty has the consequences of an entangling alliance for the nation. Similarly, the amending of a treaty merely continues such entangling alliances, changing only their character, and therefore also requires the advice and consent of the Senate. It does not follow, however, that a constitutional provision for a special concurrence (two-thirds of the Senators) prior to entry into an entangling alliance necessarily applies to its termination in accordance with its terms.[16]

4. The Constitution specifically confers no power of treaty termination on either the Congress or the Executive. We note, however, that the powers conferred upon Congress in Article I of the Constitution are specific, detailed, and limited, while the powers conferred upon the President by Article II are generalized in a manner that bespeaks no such limitation upon foreign affairs powers. "Section 1. The executive Power shall be vested in a President . . . ."[17] Although specific powers are listed in Section 2 and Section 3, these are in many instances not powers necessary to an Executive, while "The executive Power"

---

**15.** This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**16.** L. Henkin, *Foreign Affairs and the Constitution* 169 (1972).

**17.** Contrastingly, Article I, Section 1, provides: "All legislative Powers *herein granted* shall be vested in a Congress of the United States . . . ." (emphasis supplied).

referred to in Section 1 is nowhere defined. There is no required two-thirds vote of the Senate conditioning the exercise of any power in Section 1.

In some instances this difference is reflective of the origin of the particular power in question. In general, the powers of the federal government arise out of specific grants of authority delegated by the states—hence the enumerated powers of Congress in Article I, Section 8. The foreign affairs powers, however, proceed directly from the sovereignty of the Union. "[I]f they had never been mentioned in the Constitution, [they] would have vested in the federal government as necessary concomitants of nationality." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936).

The President is the constitutional representative of the United States with respect to external affairs. It is significant that the treaty power appears in Article II of the Constitution, relating to the executive branch, and not in Article I, setting forth the powers of the legislative branch. It is the President as Chief Executive who is given the constitutional authority to enter into a treaty; and even after he has obtained the consent of the Senate it is for him to decide whether to ratify a treaty and put it into effect. Senatorial confirmation of a treaty concededly does not obligate the President to go forward with a treaty if he concludes that it is not in the public interest to do so.

Thus, in contrast to the lawmaking power, the constitutional initiative in the treaty-making field is in the President, not Congress. It would take an unprecedented feat of judicial construction to read into the Constitution an absolute condition precedent of congressional or Senate approval for termination of all treaties, similar to the specific one relating to initial approval. And it would unalterably affect the balance of power between the two Branches laid down in Articles I and II.

5. Ultimately, what must be recognized is that a treaty is *sui generis*. It is not just another law. It is an international compact, a solemn obligation of the United States and a "supreme Law" that supersedes state policies and prior federal laws. For clarity of analysis, it is thus well to distinguish between treaty-making as an international act and the consequences which flow domestically from such act. In one realm the Constitution has conferred the primary role upon the President; in the other, Congress retains its primary role as lawmaker. The fact that the Constitution, statutes, and treaties are all listed in the Supremacy Clause as being superior to any form of state law does not mean that the making and unmaking of treaties can be analogized to the making and unmaking of domestic statutes any more than it can be analogized to the making or unmaking of a constitutional amendment.

The recognized powers of Congress to implement (or fail to implement) a treaty by an appropriation or other law essential to its effectuation, or to supersede for all practical purposes the effect of a treaty on domestic law, are legislative powers, not treaty-making or treaty termination powers. The issue here, however, is not Congress' legislative powers to supersede or affect the domestic impact of a treaty; the issue is whether the Senate (or Congress) must in this case give its prior consent to discontinue a treaty which the President thinks it desirable to terminate in the national interest and pursuant to a provision in the treaty itself. The existence, in practical terms, of one power does not imply the existence, in constitutional terms, of the other.

6. If we were to hold that under the Constitution a treaty could only be terminated by exactly the same process by which it was made, we would be locking the United States into all of its international obligations, even if the President and two-thirds of the Senate minus one firmly believed that the proper course for the United States was to terminate a treaty. Many of our treaties in force, such as mutual defense treaties, carry potentially dangerous obligations. These obligations are terminable under international law upon breach by the

other party or change in circumstances that frustrates the purpose of the treaty. In many of these situations the President must take immediate action. The creation of a constitutionally obligatory role in all cases for a two-thirds consent by the Senate would give to one-third plus one of the Senate the power to deny the President the authority necessary to conduct our foreign policy in a rational and effective manner.

7. Even as to the formal termination of treaties, as the District Court pointed out, "a variety of means have been used to terminate treaties." [18] There is much debate among the historians and scholars as to whether in some instances the legislature has been involved at all; they are agreed that, when involved, that involvement with the President has taken many different forms. It appears moreover that the Senate may wish to continue to determine the nature of its involvement on a case by case basis. 125 Cong.Rec. S16683–S16692 (daily ed. Nov. 15, 1979).

The District Court concluded that the diversity of historical precedents left an in-

conclusive basis on which to decide the issue of whether the President's power to terminate a treaty must always be "shared" in some way by the Senate or Congress. We agree. Yet we think it is not without significance that out of all the historical precedents brought to our attention, in no situation has a treaty been continued in force over the opposition of the President.

■ There is on the other hand widespread agreement that the President has the power as Chief Executive under many circumstances to exercise functions regarding treaties which have the effect of either terminating or continuing their vitality.[19] Prominent among these is the authority of the President as Chief Executive (1) to determine whether a treaty has terminated because of a breach, *Charlton v. Kelly*, 229 U.S. 447, 473–476, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); and (2) to determine whether a treaty is at an end due to changed circumstances.

In short, the determination of the conduct of the United States in regard to trea-

---

18. Since the first treaty to which the United States was a party was terminated in 1798 by an act of Congress, a variety of means have been used to terminate treaties: by statute directing the President to deliver notice of termination; by the President acting pursuant to a joint resolution of Congress or otherwise acting with the concurrence of both houses of Congress; by the President acting with senatorial consent; and by the President acting alone.
*Goldwater v. Carter*, 481 F.Supp. at 959 (D.D.C. 1979) (footnotes omitted).

19. The Senate Committee on Foreign Relations after careful consideration of the matter came to the conclusion that there were 14 different bases on which the President could terminate a treaty in the course of his executive function. The grounds identified are the following:

 (1) in conformity with the provisions of the treaty;

 (2) by consent of all the parties after consultation with the other contracting states;

 (3) where it is established that the parties intended to admit the possibility of denunciation or withdrawal;

 (4) where a right of denunciation or withdrawal may be implied by the nature of the treaty;

 (5) where it appears from a later treaty concluded with the same party and relating

to the same subject matter that the matter should be governed by that treaty;

 (6) where the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time;

 (7) where there has been a material breach by another party;

 (8) where the treaty has become impossible to perform;

 (9) where there has been a fundamental change of circumstances;

 (10) where there has been a severance of diplomatic or consular relations and such relations are indispensable for the application of the treaty;

 (11) where a new peremptory norm of international law emerges which is in conflict with the treaty;

 (12) where an error was made regarding a fact or situation which was assumed by that state to exist at the time when the treaty was concluded and formed an essential basis of its consent to be bound;

 (13) where a state has been induced to conclude a treaty by the fraudulent conduct of another state; and

 (14) where a state's consent to be bound has been procured by the corruption or coercion of its representatives or by the threat or use of force.
S.Rep.No.119, 96th Cong., 1st Sess. 10 (1979).

ties is an instance of what has broadly been called the "foreign affairs power" of the President. We have no occasion to define that term, but we do take account of its vitality. The *Curtiss-Wright* opinion, written by a Justice who had served in the United States Senate, declares in oft-repeated language that the President is "the sole organ of the federal government in the field of international relations." [20] That status is not confined to the service of the President as a channel of communication, as the District Court suggested, but embraces an active policy determination as to the conduct of the United States in regard to a treaty in response to numerous problems and circumstances as they arise.

8. How the vital functions of the President in implementing treaties and in deciding on their viability in response to changing events can or should interact with Congress' legitimate concerns and powers in relating to foreign affairs is an area into which we should not and do not prematurely intrude. History shows us that there are too many variables to lay down any hard and fast constitutional rules.

We cannot find an implied role in the Constitution for the Senate in treaty termination for some but not all treaties in terms of their relative importance. There is no judicially ascertainable and manageable method of making any distinction among treaties on the basis of their substance, the magnitude of the risk involved, the degree of controversy which their termination would engender, or by any other standards. We know of no standards to apply in making such distinctions. The facts on which such distinctions might be drawn may be difficult of ascertainment; and the resolu-

tion of such inevitable disputes between the two Branches would be an improper and unnecessary role for the courts. To decide whether there was a breach or changed circumstances, for example, would involve a court in making fundamental decisions of foreign policy and would create insuperable problems of evidentiary proof. This is beyond the acceptable judicial role. All we decide today is that two-thirds Senate consent or majority consent in both houses is not necessary to terminate this treaty in the circumstances before us now.

9. The circumstances involved in the termination of the Mutual Defense Treaty with the Republic of China include a number of material and unique elements. Prominent is assertion by the officials of both the Republic of China and the People's Republic of China that each of them is the government of China, intending the term China to comprehend both the mainland of China and the island of Taiwan. In the 1972 Shanghai Communique, the United States acknowledged that position and did not challenge it.[21] It is in this context that the recent Joint Communique set forth as of January 1, 1979 that the United States recognizes the People's Republic of China as "the sole legal government of China." [22] This action made reference to "the people of Taiwan," stating that the peoples of the United States and Taiwan "will maintain cultural, commercial and other unofficial relations." This formulation was confirmed by the Taiwan Relations Act.[23]

 It is undisputed that the Constitution gave the President full constitutional authority to recognize the PRC and to dere-

---

**20.** *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) (Sutherland, J.).

**21.** The United States declared: "The United States acknowledges that all Chinese on either side of the Taiwan Strait maintain there is but one China and that Taiwan is a part of China. The United States Government does not challenge that position." 66 Dep't State Bull. 435 (1972).

**22.** "The United States of America recognizes the Government of the People's Republic of China as the sole legal Government of China. Within this context, the people of the United States will maintain cultural, commercial, and other unofficial relations with the people of Taiwan." 14 Weekly Comp. of Pres.Doc. 2264 (Dec. 18, 1978).

**23.** Taiwan Relations Act, Pub.L.96–8, 93 Stat. 14 (April 10, 1979).

cognize the ROC.[24] What the United States has evolved for Taiwan is a novel and somewhat indefinite relationship, namely, of unofficial relations with the people of Taiwan. The subtleties involved in maintaining amorphous relationships are often the very stuff of diplomacy—a field in which the President, not Congress, has responsibility under our Constitution. The President makes a responsible claim that he has authority as Chief Executive to determine that there is no meaningful vitality to a mutual defense treaty when there is no recognized state.[25] That is not to say that the recognition power automatically gives the President authority to take any action that is required or requested by the state being recognized. We do not need to reach this question. Nevertheless, it remains an important ingredient in the case at bar that the President has determined that circumstances have changed so as to preclude continuation of the Mutual Defense Treaty with the ROC; diplomatic recognition of the ROC came to an end on January 1, 1979, and now there exists only "cultural, commercial and other unofficial relations" with the "people on Taiwan."

10. Finally, and of central significance, the treaty here at issue contains a termination clause. The existence of Article X of the ROC treaty, permitting termination by either party on one year's notice, is an overarching factor in this case, which in effect enables all of the other considerations to be knit together.

Without derogating from the executive power of the President to decide to act contrary to the wording of a treaty—for example, because of a breach by the other party (*Charlton v. Kelly, supra*), or because of a doctrine of fundamental change of circumstances (*rebus sic stantibus*)—the President's authority as Chief Executive is

at its zenith when the Senate has consented to a treaty that expressly provides for termination on one year's notice, and the President's action is the giving of notice of termination.

As already noted, we have no occasion to decide whether this factor would be determinative in a case lacking other factors identified above, *e. g.*, under a notice of withdrawal from the NATO treaty unaccompanied by derecognition of the other signatories. No specific restriction or condition on the President's action is found within the Constitution or this treaty itself. The termination clause is without conditions and without designation as to who shall act to terminate it. No specific role is spelled out in either the Constitution or this treaty for the Senate or the Congress as a whole. That power consequently devolves upon the President, and there is no basis for a court to imply a restriction on the President's power to terminate not contained in the Constitution, in this treaty, or in any other authoritative source.

———

While under the termination clause of this and similar treaties the power of the President to terminate may appear theoretically absolute, to think that this is so would be to ignore all historical practices in treaty termination and past and current reciprocal relationships between the Chief Executive and Congress. The wide variety of roles played by the Executive and the Congress (or the Senate alone) in the past termination of treaties teaches us nothing conclusive as to constitutional theory, but it instructs us as to what may fairly be contemplated as to the President's future exercise of the treaty termination power. Treaty termination is a political act, but political acts are not customarily taken without po-

---

24. *See United States v. Pink*, 315 U.S. 203, 229–230, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); U.S.Const. art. II, § 3 (the President "shall receive Ambassadors and other public Ministers").

25. Appellees urge that the Treaty had continuing validity because of the de facto existence of

Taiwan. What government—de facto or de jure—is representative of a foreign state is a question to be determined by the political department, and thus is beyond the ambit of judicial review. *United States v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *Jones v. United States*, 137 U.S. 202, 212–14, 11 S.Ct. 80, 34 L.Ed. 691 (1890).

litical support. Even if formal advice and consent is not constitutionally required as a prerequisite to termination, it might be sought. If the Congress is completely ignored, it has its arsenal of weapons, as previous Chief Executives have on occasion been sharply reminded.

■ Thus, the court is not to be taken as minimizing the role of the legislature in foreign affairs. The legislature's powers, including prominently its dominant status in the provision of funds, and its authority to investigate the Executive's functioning, establish authority for appropriate legislative participation in foreign affairs. The question of whether the Senate may be able to reserve to itself in particular treaties, at the time of their original submission, a specific role in their termination is not presented by the record in this appeal and we decide nothing with respect to it. The matter before us is solely one of whether the Constitution nullifies the procedure followed by the President in this instance. We find the President did not exceed his authority when he took action to withdraw from the ROC treaty, by giving notice under Article X of the Treaty, without the consent of the Senate or other legislative concurrences.

### III

■ In our holding in this case we do not ignore the question of justiciability. We regard the only issue here to be whether the constitutional allocation of governmental power between two branches requires prior legislative consent to the termination of this treaty under the circumstances presented by this record. Viewing the issue before us so narrowly and in the circumstances of this treaty and its history to date, we see no reason which we could in good conscience invoke to refrain from judgment, and conclude that it is the duty of the court to confront and decide that issue.

*Reversed.*[26]

WRIGHT, Chief Judge, with whom TAMM, Circuit Judge, joins, concurring in the result:

We agree that the judgment and opinion of the District Court must be vacated and that appellees' complaint must be dismissed. Because we believe the appellees lack standing, we reach no other issue.

Appellees are nine Senators and sixteen members of the House of Representatives. They assert that the President's unilateral termination of this country's Mutual Defense Treaty with the Republic of China is illegal, and that they have standing to litigate this issue because the President's action personally injured them in fact by depriving them of their right to vote for or against termination.

### I

Both Article III of the Constitution and the demands of prudent judicial administration bar lawsuits by parties who are only generally and indistinguishably offended by alleged illegal acts of government. The proper redress for such offenses is political, not judicial. The courts' role begins only where a party alleges " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (emphasis in original).

The essence of the claim in this case is that unless the federal courts intervene the President will terminate the Mutual Defense Treaty in a manner that violates the constitutional restrictions on his powers. All Americans have a stake in seeing that their leaders act according to the constitu-

---

**26.** We note that Judge MacKinnon's position also requires a reversal of the District Court. Judge Gasch's judgment forbids further action to terminate the treaty without *either* consent of the Senate by a two-thirds vote *or* a vote by a majority of both Houses of Congress. Judge MacKinnon clearly would require action by both Houses; hence Judge Gasch's approval of Senate advice and consent as sufficient is reversed without dissent.

tional scheme. The question here is whether these plaintiff-appellees have a specific personal stake in the outcome of the case.

Appellees gain no particular stake simply by being members of Congress. This court has made clear that a legislator "receives no special consideration in the standing inquiry." *Reuss v. Balles*, 189 U.S.App.D.C. 303, 308, 584 F.2d 461, 466 (D.C.Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). The interests of an elected representative do not necessarily differ from those of his constituents. In fact, courts could logically afford legislators even *less* consideration on standing than they afford other citizens, since the legislator's position gives him special access to the political process through which general constitutional grievances should find redress. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220–227, 94 S.Ct. 2945, 41 L.Ed.2d 706 (1974). Thus, to sustain their lawsuit plaintiff senators and congressmen must demonstrate a "distinct and palpable injury" to themselves. *See Warth v. Seldin, supra*, 422 U.S. at 501, 95 S.Ct. 2197.

Although the courts have fashioned various verbal formulas to describe the Article III jurisdictional requirement of case or controversy, the core concern has remained single and unquestioned: that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). The verbal formulas help in focusing on the practical question underlying the general principle—the question of the nature and circumstances of the specific *injury* alleged. Thus, the plaintiff must show an "injury in fact," *Schlesinger v. Reservists Committee to Stop the War, supra*, 418 U.S. at 227 n.16, 94 S.Ct. 2945, that "fairly can be traced to the challenged action of the defendant," and not to "the independent action of some third party not before the court," *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), and that is "likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924. However many "prongs" comprise the test, the question is specific and factual: Has the plaintiff identified the proper defendant, the adversary who has dealt him distinct injury?

In addressing that practical question in this case, we must accept as true the material allegations of the complaint. *Warth v. Seldin, supra*, 422 U.S. at 501, 95 S.Ct. 2197. We therefore assume as a matter of constitutional law that President Carter was required to obtain consent from either two-thirds of the Senate or a majority of both Houses before giving notice of termination of the Treaty.[1] The most distinct injury alleged is that the President has prevented the appellees from voting on treaty termination.[2]

The question of standing where a legislator claims injury to his lawmaking role is not new to this court. Although there are "no special standards to be employed in analyzing legislator standing questions,"

---

1. Since we assume, in accord with the complaint and the District Court decision, that either method of consent is acceptable, we need not distinguish the standing problems of appellee members of the House of Representatives from those of appellee senators.

2. The complaint implies two other injuries. One which appellees do not press on appeal is the injury to their "sworn duty to preserve, protect and defend the Constitutional allocation of powers to the Executive and Legislative branches of the federal government." Complaint at 3. Since this injury is nothing more than a general grievance about alleged illegal conduct, it affords no basis for standing. The other injury is that alleged by Senator Thurmond and former Senator Curtis—the alleged nullification of their original 1955 votes to consent to ratification of the Treaty. The District Court rejected standing on that ground, and we agree. The 25-year life of the Treaty has given substantial effect to those 1955 votes, and so the President cannot be said to have rendered them "a direct and immediate nullity, as if [they] had not cast the vote at all." *Harrington v. Bush*, 180 U.S.App.D.C. 45, 66, 553 F.2d 190, 211 (D.C.Cir.1977).

The allegation that the President has impaired Congress' right to be *consulted* on the treaty termination is really inseparable from the allegation of injury to opportunity to vote.

*Reuss v. Balles, supra*, 189 U.S.App.D.C. at 307, 584 F.2d at 465, we have developed a strict approach to evaluating the unique type of injury that arises when a legislator challenges Executive action. Along with the other circuits that have faced the issue,[3] we have required congressional complainants to allege a precise injury. The only case in which we have actually *held* that an individual legislator had standing to contest Executive action[4] illustrates the nature of the requisite injury.

In *Kennedy v. Sampson*, 167 U.S.App. D.C. 192, 511 F.2d 430 (D.C.Cir.1974), a senator sought to challenge the President's pocket veto of a bill passed by overwhelming majorities of both Houses. We granted Senator Kennedy standing on the theory that the President's action impaired Congress' role in the constitutional scheme of lawmaking, and thus indirectly impaired the effectiveness of the Senator's individual vote. Under the paradigm of injury emerging from *Kennedy*, if the legislature manifests its will through final legislative action, and if the Executive nullifies the effect of that legislative action, a legislator whose vote contributed to the legislative action will have standing. The injury derives from the injury to the legislature, and becomes personal to the individual congressman-plaintiff.

We decided *Kennedy* before the recent Supreme Court decisions that have considerably tightened standing requirements. *E. g., Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Org., supra; Warth v. Seldin, supra*. In the light of these cases, we have held that *Kennedy* does not confer standing where a legislator claims injury to his general effectiveness as a lawmaker as he subjectively perceives it, *Harrington v. Bush*, 180 U.S.App.D.C. 45, 66–69, 553 F.2d 190, 211–213 (D.C.Cir.1977); *Metcalf v. Nat'l Petroleum Council*, 180 U.S.App.D.C. 31, 40–41, 553 F.2d 176, 185–186 (D.C.Cir.1977), or even where a legislator claims the Executive has injured the effectiveness of a particular past vote by failing to properly administer the specific legislation as enacted. *Harrington v. Bush, supra*, 180 U.S.App.D.C. at 69–70, 553 F.2d at 213–214. Most to the point here, we have declined the occasion to confer standing where a legislator alleges injury to an *opportunity* to cast a specific *future* vote. *See id.* at 66, 553 F.2d at 211; *Reuss v. Balles, supra*, 189 U.S.App.D.C. at 308–310, 584 F.2d at 466–468. We have required the plaintiff legislator to show that the challenged Executive action has *nullified* a vote

---

3. *E. g., Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975); *Holtzman v. Schlesinger*, 484 F.2d 1307, 1315 (2d Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

4. In *Mitchell v. Laird*, 159 U.S.App.D.C. 344, 488 F.2d 611 (D.C.Cir.1973), we stated that 13 congressmen had standing to seek a declaratory judgment that our participation in the Vietnam war was illegal, on the ground that the relief requested would "bear upon" their duties as congressmen to pass appropriations, impeach officials, and perform other legislative acts. But in the light of *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215 n.5, 94 S.Ct. 2945, 41 L.Ed.2d 706 (1974), that statement was only dictum. Moreover, its only remaining significance in this circuit lies in its repudiation in *Harrington v. Bush, supra*, note 2, 180 U.S.App.D.C. at 64, 553 F.2d at 209. The flaw of *Mitchell's* "relevancy" standard is that it ignores Article III's demand of proof of a distinct *injury*.

Two other cases deserve note here. In *Edwards v. Carter*, 580 F.2d 1055 (D.C.Cir.), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978), we proceeded to the merits of a congressmen's suit against the President. But there we chose not to address the standing issue at all, since, under constraints peculiar to that case, rejection of the plaintiffs' claim on the merits was the most efficient disposition. In *Pressler v. Simon*, 428 F.Supp. 302 (D.D.C. 1976), *aff'd mem. sub nom. Pressler v. Blumenthal*, 434 U.S. 1028, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978), a three-judge court granted a congressman standing on the basis of alleged impairment of future voting rights. But the Supreme Court's summary affirmance of the three-judge court's rejection of the plaintiff's claims may well have been predicated on a lack of standing. *Pressler v. Blumenthal*, 434 U.S. 1028; 1029, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978) (Rehnquist, J., concurring).

already taken by preventing it from ever taking its intended legal effect.[5]

The Supreme Court's pronouncements on standing compel this view. As we have noted, where a legislator alleges Executive impairment of the effectiveness of his vote, his injury can only be derivative. He cannot suffer injury in fact unless Congress has suffered injury in fact. Congress suffers no injury unless the Executive has thwarted its will; and there is no such will to thwart unless a majority of Congress has spoken unequivocally.[6] Unless Congress has taken all final action in its power to exercise its constitutional prerogative, any injury an individual legislator suffers may find its source not in the President, but in his colleagues in Congress. Where Congress itself, and not the Executive, renders an individual legislator's vote ineffective, the courts have no role.[7] *Harrington v. Bush, supra,* 180 U.S.App.D.C. at 69, 553

F.2d at 214; *Holtzman v. Schlesinger,* 484 F.2d 1307, 1311 (2d Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

In this case, neither House has ever taken final action to voice disapproval of the termination of the Treaty. In holding that appellees had standing, the District Court accepted their argument that congressional action on the termination effectively amounted to a confrontation with the President. The majority now asserts that Congress has done all it can practically do—short of obtaining judicial relief—to prevent the President from unilaterally terminating the Treaty. But the actual sequence of events in Congress belies these positions. As we demonstrate below, Congress was well aware of strong legislative measures within its means for expressing disapproval of the termination. It simply did not take those measures.

5. *Kennedy* explicitly denied that the Senator's standing derived from any injury to his prospective right to vote to override a presidential veto. *Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 196 n.13, 511 F.2d 430, 434 n.13 (D.C.Cir. 1974). Moreover, our decision there relied heavily on *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), where state senators who had voted against ratification of a constitutional amendment gained standing to challenge the legality of the lieutenant governor's tie-breaking vote in favor of ratification. We stressed that in *Coleman* the legislators' votes would have had objective legal effect absent the challenged executive action.

In *Harrington v. Bush, supra* note 2, we inferred from *Kennedy* some concern for the future override vote. But we noted there that in *Kennedy* the prospective vote had borne a unique nexus to the nullified past vote. The two votes were steps in a single legislative act. 180 U.S.App.D.C. at 66, 553 F.2d at 211. Thus, even if in *Kennedy* we did perceive some important injury to the prospective vote, the injury was wholly dependent on the harm to the past vote. No such nexus exists here. The only arguably relevant past vote is the 1955 vote to consent to ratify the Treaty. But that vote has never been nullified, *see* note 2 *supra,* nor is it part of a single legislative act along with the prospective vote on treaty termination.

The majority's superficial summary of the congressional standing cases within this circuit blurs the clear distinctions those cases have created. It is true, as the majority notes, that a congressman does not suffer a distinct injury

when the administration fails to properly carry out a law passed by a Congress of which he was a member. *See* majority op. at note 7. But that situation is clearly distinct from the one in *Kennedy,* in which the President's action prevented a final congressional action from ever taking its intended legal effect in the first place. There is thus little logic in the majority's view that a claim of nullification of a past vote alone is a poor ground for standing, because that was precisely the ground on which *Kennedy* itself relied. In rather glibly asserting that the nullification of an opportunity to vote creates standing just as readily as does the nullification of a past vote, the majority simply ignores a good deal of the reasoning that pervades this line of cases.

6. One other possible basis of standing has no application here—where a majority of Congress approves a lawsuit by expressly authorizing a member or a committee to represent it in the courts. *See United States v. American Telephone & Telegraph Co.,* 179 U.S.App.D.C. 198, 205, 551 F.2d 384, 391 (D.C.Cir.1976); *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 162 U.S.App.D.C. 183, 185, 498 F.2d 725, 727 (D.C.Cir.1974).

7. The majority's conclusory assertion that "[n]othing in *Kennedy v. Sampson,* nor in the logic of what constitutes injury in fact, justifies such a limitation," majority op. at note 12, is bewildering in its failure to acknowledge this principle.

Appellees point to, and the District Court relied on, such congressional actions as the Dole-Stone amendment and the vote to restore the original language drafted by Senator Harry Byrd, Jr. as Senate Resolution 15. Only the Byrd amendment has even the pretense of being final legislative action disapproving the termination of this particular treaty.[8] Yet Senator Harry Byrd, Jr. stated himself that the resolution would have no binding legal effect on the President and that it was meant to express neither approval nor disapproval of the President's actions.[9] Whether the resolution would have been prospective or retrospective in effect remains in doubt. Ten pages of the Congressional Record of June 6 are devoted to a discussion among the Senators about what effect the Byrd resolution as written would have.[10] Senator Church and, on the next day of discussion, Senator Goldwater introduced conflicting amendments [11] to clarify the resolution. But the Senate adjourned without deciding which version to adopt.[12]

Moreover, whatever the potential effect of the resolution, the Senate never actually voted to approve it. As a matter of textbook parliamentary procedure, the vote on which the District Court so heavily relied in reversing itself on standing was simply an interim procedural vote to choose the language of the resolution to be voted on.

8. The Dole-Stone amendment sought only consultation with the President and did not ask for a congressional vote on termination of the Treaty.

9. Senator Harry Byrd, Jr. said that he had no desire to "rewrite history." 125 Cong.Rec. S7048, col. 2–3 (daily ed. June 6, 1979).

10. Id. at S7054–S7064. The remarks of Senator Exon illustrate this confusion:

I, for one, supported the Byrd amendment this afternoon, with the assumption and the understanding in my mind, * * * that I was not resurrecting the problem before the Senate with respect to the problems with Taiwan. I thought I was voting for the future * * *. Yet, I have been here now for about 4 hours and I am beginning to wonder just what is going on, on the amendment that I voted for.

Id. at S7060.

11. In order to ensure that passage of the resolution would not be construed by the courts as disapproving the President's termination of the Treaty, Senator Church introduced the following amendment:

The provisions of this Resolution shall not apply with respect to any treaty the notice of termination of which was transmitted prior to the date of this resolution.

Id. at S7061. He explained his position as follows:

Now, if the proponents really are serious when they say that their purpose is * * * not to exhume the question of Taiwan and the treaty that the President has given notice he will terminate—then all they have to do is accept this language. Then there can be no question either for a court to pass upon, or for anyone * * * to misconstrue, for we will be clearly making this sense of the Senate resolution prospective * * *.

Id. at S7061.

Twelve days later, Senator Goldwater proposed the following substitute for the Church amendment:

(1) The provisions of the resolution shall not be construed to approve or disapprove of the termination of the Mutual Defense Treaty with the Republic of China, such termination not having been submitted to the Senate or Congress for approval prior to the date of adoption of this resolution, and (2) nor shall anything in the resolution be construed to reduce or prejudice any of the constitutional powers of the Senate.

Id. at S7862 (daily ed. June 18, 1979).

The Senate was fully aware of the relation of its actions to the suit in District Court. Senator Goldwater explained Judge Gasch's June 6 order to the Senate, id. at S7033–S7035 (daily ed. June 6, 1979), and provided each Senator with a summary of the order before the vote on the Byrd amendment. Senator Church read relevant portions of the order during the debate, id. at S7058, and printed the order in its entirety in the Congressional Record. Id. at S7062–S7064.

12. On June 21, 1979 the Senate resumed consideration of Resolution 15, see id. at S8189–S8195 (daily ed.), but took no action. Later that day the Majority Leader exercised his parliamentary authority to return the resolution to the calendar. Once again, after oral argument was heard in this court, the Senate debated the resolution, but again took no action. Id. at S16683–S16692 (daily ed. Nov. 15, 1979). As explained by Senate Parliamentarian Murray Zweben, no final action has been taken on Senate Resolution 15, and the Senate "may or may not return to its consideration in the future." JA 659.

Even those Senators who had voted for the Byrd amendment remained free to vote against the resolution in any final action. Indeed, it was to give the Senators an opportunity to reflect on the consequences of their action that the resolution was taken from the floor.[13]

Consideration of the resolution ended when Senator Goldwater and his colleagues failed to agree on legislative language for the Senate to vote on.[14] On the Senate floor on November 15, Senator Robert Byrd, the Majority Leader, expressed his desire for an "up-and-down vote" on the issue,[15] but after extensive discussion proved inconclusive, he proceeded to other business. The question of Senate Resolution 15 has never returned to the floor. Thus the President himself has not nullified the effect of any vote appellees have actually cast,[16] nor has he thwarted the will of Congress in the special sense our cases demand. Congress has not suffered the requisite injury, and so neither have appellees.[17] Any harm they have suffered can be "fairly traced" to their minority position in the

legislature, and to the vagaries of politics. Surely courts cannot be expected to manage the calendar of the United States Senate.

Congress as a body has chosen not to confront the President directly on the treaty termination. Denied that confrontation by political reality, appellees now turn to this court. But as we have said, relief for political injury must be political, and the opportunities for relief have been ample. Appellees have always had the legal, if not the political, power to obtain passage of a bill directing the President to cancel notice of termination of the Treaty, or at least declaring Congress' belief that the Treaty remained in effect absent legislative approval of its termination.[18] Had appellees done so, we might have been presented with a different case. To be sure, under standing doctrine the availability of remedies outside the courts does not of itself preclude jurisdiction, where the plaintiff has shown sufficient injury. *Metcalf v. Nat'l Petroleum Council, supra,* 180 U.S.App.D.C. at 44 n.29, 553 F.2d at 189 n.29.[19] But in this

13. Senator Church expressed his opinion that, in voting on the Goldwater amendment, the Senate would "be voting on whether to reopen the past." *Id.* at S7862 (daily ed. July 18, 1979). Calling this "an action fraught with mischief," he suggested that the Senate be given "an opportunity to reflect upon this before pressing it to a vote." *Id.* The Senate immediately proceeded to the next order of business.

14. Between November 13 and November 15, the Majority Leader met several times with Senators Goldwater, Harry Byrd, Church, and Javits in an attempt to attain agreement on legislative language concerning treaty termination. No agreement was reached. *See id.* at S16684 (daily ed. Nov. 15, 1979) (statement of Senator Robert Byrd).

15. *Id.*

16. Even if an alleged injury to a prospective vote were judicially cognizable, the complaint merely states, "Should the matter be placed before them as required by law, certain Plaintiffs, as well as many of their colleagues in the Congress, would object" to the termination of the Treaty. Complaint at 12. Thus there is no allegation that all plaintiffs would vote against termination, nor can we tell which particular plaintiffs would do so. The uncertainty on this point makes appellees' injury yet more speculative.

17. The majority opinion attempts to circumvent the requirement of final action by asserting that since the President never formally submitted the treaty termination to Congress, he has already dealt them a distinct injury—depriving them of their vote within the prescribed constitutional scheme. There may well be, as the majority opinion suggests, practical political differences between voting on a treaty termination submitted by the President and initiating an independent resolution within Congress. The very point, however, is that those differences are political, not legal. Moreover, the specific mode by which the President and Congress interact is a political question in which the courts have no say. *See Holtzman v. Schlesinger, supra* note 3, 484 F.2d at 1309; *Orlando v. Laird,* 443 F.2d 1039, 1043 (2d Cir.), *cert. denied,* 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971).

18. We offer no opinion whether two-thirds of the Senate could accomplish the same goal by expressly conditioning its original approval of the formulation of a treaty on its power to veto any attempt by the President to terminate the treaty by a similar two-thirds vote.

19. The defendants argued in *Kennedy* that the Senator had no standing because Congress could pass the pocket-vetoed bill anew and time the passage to preclude a pocket veto.

case appellees' apparent political inability to "exhaust" their legislative remedies rebuts their very allegation of judicially cognizable injury, as well as its source in the President's actions.

## II

Article III of the Constitution permits federal courts to hear only cases in which the adversariness of the parties creates a sharpened factual controversy. This is, of course, the root of the standing doctrine. But the standing doctrine also includes a principle of "judicial self-governance," without which the courts would end up deciding "abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin,* supra, 422 U.S. at 500, 95 S.Ct. at 2206. This second, prudential, aspect of the standing doctrine is especially significant in this case.

The issue here is whether or in what manner Congress and the President share the power to terminate treaties. For over 200 years, through bargaining, compromise, and accommodation, these popularly elected branches of our government have in fact shared the task, without the help or need of the courts. There has never been a single, settled method of termination. 5 *G. Hackworth, Digest of International Law* 330 (1943). Plaintiffs and defendants here have offered competing interpretations of how the long sequence of treaty terminations in our history was accomplished.[20] Whether or not the historical record supports either party's substantive constitutional argument—and we express no views on this—it does show that when Congress wants to participate directly in a treaty termination it can find the means to do so. Thus Congress had initiated the termination of treaties by directing or requiring the President to give notice of termination, without any prior presidential request.[21] Congress has annulled treaties without any presidential notice.[22] It has conferred on the President the power to terminate a particular treaty,[23] and it has enacted statutes practically nullifying the domestic effects of a treaty and thus caused the President to carry out termination.[24] If Congress can do this, it can pass a resolution objecting to termination of a treaty if it wishes to do so. A President is likely to pay heed to such dis-

We rejected that argument, but only because that remedy essentially involved beginning an entirely new legislative action. *Kennedy v. Sampson,* supra note 5, 167 U.S.App.D.C. at 197–198 n.17, 511 F.2d at 435–436 n.17. Here, the alternate remedy would be a single legislative action which Congress has never taken.

20. Appellees identify some 55 treaties or provisions of separate treaties that the United States has terminated. By their reckoning, 52 have been terminated with express or implied legislative approval (39 at the initiative of the Congress) and only three treaties have been terminated by unilateral presidential action. Appellees' brief at 57–62. Appellants for their part have found 26 instances of treaty termination actions by the President. They claim that in 13 of those instances the President acted without the participation of the Congress. Appellants' brief at 53–57.

What is significant for our purposes is the fact, acknowledged by both parties, that congressional involvement in the treaty termination process has taken a variety of forms. *See* appellants' brief at 56–57; appellees' brief at 57–62.

21. *E.g.,* J.Res. of Jan. 18, 1865, 13 Stat. 566 (1866) (Reciprocity Treaty of 1854 with Great Britain); J.Res. of June 17, 1874, 18 Stat. 287 (1875) (Commercial Convention with Belgium); Act of March 3, 1883, 22 Stat. 641 (Amity Treaty of 1871 with Great Britain); *see Ropes v. Clinch,* 20 F.Cas. 1171 (C.C.S.D.N.Y.1871) (No. 12,041).

22. *E.g.,* Act of July 7, 1798, 1 Stat. 578 (1861) (Treaty of Alliance of 1778 with France).

23. *E.g.,* Foreign Assistance Act of 1961, Pub.L. No.87–195, 75 Stat. 424 (Commercial Convention of 1902 with Cuba).

24. *E.g.,* Tariff Act of July 24, 1897, 30 Stat. 151, ch. 11 § 3 (Commercial Convention of 1850 with Switzerland); *see Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888) ("a treaty is placed on the same footing, and made of like obligation, with an act of legislation" and so may be superseded just as a statute).

approval, in which event no court need intervene.[25]

Moreover, Congress has a variety of powerful tools for influencing foreign policy decisions that bear on treaty matters. Under Article I, Section 8 of the Constitution, it can regulate commerce with foreign nations, raise and support armies, and declare war. It has power over the appointment of ambassadors and the funding of embassies and consulates. Congress thus retains a strong influence over the President's conduct in treaty matters.

As our political history demonstrates, treaty creation and termination are complex phenomena rooted in the dynamic relationship between the two political branches of our government. We thus should decline the invitation to set in concrete a particular constitutionally acceptable arrangement by which the President and Congress are to share treaty termination. This principle of prudence especially counsels against judicial intervention in a case like this, where Congress has taken no final action to make known its views on the termination of a particular treaty. Were a President to attempt to unilaterally break a treaty vital to the interests of the nation, without sound reason and against the wishes of the great majority of citizens, congressional representatives, by any means they have already used or by those they may yet design, can ensure that the voice of that majority reaches the President.

### III

Managing the foreign relations of a great nation is an intensely political undertaking calling for the greatest skills and the exercise of the most informed judgments, for the stakes are high. It is an area in which judges have no special competence or experience. Unless a case or controversy fully satisfying the constitutional command is presented for adjudication, a court should stay its hand. Since the constitutional command is not satisfied in this case, in our judgment it is appropriate that the court dismiss it without more. We would do so. To come to the same result after a journey through an uncharted judicial wilderness, dropping hints or attempting to set in concrete how future foreign relations cases might be decided, invites additional unnecessary, and potentially dangerous, judicial incursions into the area.

MacKINNON, Circuit Judge, dissenting in part and concurring in part.

I concur in the decision of a majority of my colleagues that the Senators and Representatives who are the plaintiffs in this action possess standing to have their grievance decided by this court, and that the question raised is not a "political" one that we should decline to adjudicate. We are not deciding a political question, but merely determining the procedure to be followed under the Constitution for the termination of a treaty. I disagree, however, with the majority's conclusion on the merits that the Constitution confers the absolute power on the President, *acting alone*, to terminate this Mutual Defense Treaty. No prior President has ever claimed the absolute power to terminate such a treaty.

**25.** As the majority concedes, the heart of its reasoning is that even if Congress does take a final vote disapproving treaty termination, the President might well ignore it and persist in carrying out the termination. Thus, the majority asserts, the appellees' injury is already manifest.

Even if the President does now take such a stand, the perspective of this 200-year-old, continuing political controversy suggests that we view that stand as a bargaining position which cannot confer standing where it would not otherwise exist. Since there has been no definitive congressional vote disapproving termination, a large enough number of congressmen may well *agree* with the President's view of the constitutional issue as to prevent any legal controversy. Similarly, no matter how resolute the President's position appears, we cannot know if he would maintain it in the face of an unequivocal vote of disapproval by Congress.

Thus we see how the standing issue in this case may be cast as a *ripeness* issue. The President's alleged position may *portend* a true legal controversy, but it remains part of a chain of contingency too attenuated to confer standing. *Compare Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The majority in effect holds that the President has the absolute power to terminate *this* treaty but their decision indicates it is not to be considered as a binding precedent that future Presidents could terminate treaties in similar circumstances. This advance attempt to minimize its harmful effect for the future is accomplished by stating that the opinion is "narrow" and could not necessarily be relied upon to confer the same absolute power to terminate the NATO treaty, which has a similar termination provision. Maj. op., p. —— of 199 U.S.App.D.C., p. 707 of 617 F.2d. History will not deal kindly with such an obviously expedient decision.

My interpretation is based on the admitted fact that the termination of treaties is not one of the enumerated powers of the Constitution. Rather it is an implied power vested in the government. As such, under the "Necessary and Proper" clause of Article I, Section 8, which the majority decision avoids like the plague, power is conferred upon *"[t]he Congress"* to pass a law to terminate treaties. Since the Constitution makes treaties along with other laws the "Law of the Land", Article II, Section 2, a treaty is to be terminated in the same manner as any other "law"—by a formal act of Congress approved by the President. The language of the Constitution, its interpretation by the Framers, and historical precedent overwhelmingly support such a conclusion.

This is thus *not* a case where, as the President contends: "[t]here are no judicially discoverable and manageable standards for determining the extent of constitutionally required legislative participation in treaty termination." Appellant's Brief, p. 14. The judicial standards are easily discoverable in the Constitution.*

* The following opinion is not short because the attempted task of a dissent is twofold: demonstrate error and prove the contrary.

1. Article II, Section 2 of the U.S. Constitution provides:
 The President . . . shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; . . . ."

I *The Enumerated Powers of the Constitution and the Power to Terminate Treaties.*

The Constitution of the United States establishes a government of three departments, each with *enumerated* powers. One of the enumerated powers vested in the President is the power to *"make* Treaties, . . . provided two thirds of the Senators present concur . . . ."* Art. II, Section 2.[1] (Emphasis added). "Treaties" so made and ratified, together with the Constitution and laws of the United States, become "the supreme Law of the Land . . . ." Art. VI (Emphasis added).[2] While the power to "make treaties" is a constitutionally enumerated power, the power to repeal or terminate treaties is *not* one of the enumerated powers. Yet it is manifest that the termination of treaties is frequently necessary. It must thus be recognized that the power to terminate treaties is one of the *implied powers* that the Constitution implicitly vested in the *Government* when it provided for the "making" of treaties. The facts here present another case involving the power of Congress to legislate under the Necessary and Proper clause, as in *Wayman v. Southard*, 10 Wheat. (23 U.S.) 1, 20, 6 L.Ed. 253 (1825), where Chief Justice Marshall said: [it] "seems to be one of those plain propositions which reasoning cannot make plainer. The terms of the clause neither require nor admit of elucidation . . . ." Later, Justice Harlan in *Neely v. Henkel*, 180 U.S., 120, 21 S.Ct. 302, 45 L.Ed. 457 (1901), which held for a unanimous court that the necessary and proper clause applied to the treaty power and treaties executed thereunder, said:

2. Article VI of the U.S. Constitution provides:
 "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . ."

The power of Congress to make all laws *necessary and proper* for carrying into execution as well the powers enumerated in section 8 of article I of the Constitution, as all others vested in the Government of the United States, or in any Department or the officers thereof, includes the power to enact such legislation as is appropriate to give efficacy to any stipulations which it is competent for the President by and with the advice and consent of the Senate to insert in a treaty with a foreign power.

180 U.S. at 121, 21 S.Ct. at 306 (Emphasis added). This clearly recognizes the power of Congress to enact legislation pursuant to the termination clause that President Eisenhower had inserted in the Taiwan Treaty. *Missouri v. Holland*, 252 U.S. 416, 432, 49 S.Ct. 382, 64 L.Ed. 641 (1920) also squarely holds that the necessary and proper clause applies to treaty provisions.

It is thus submitted that since the exercise of the power to terminate treaties, which have the status of law of the land, requires passage of a repealing law, it is Congress' responsibility under the Necessary and Proper Clause to do so. In Article I, Section 8, the Clause provides:

The Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing [enumerated] Powers, and *all other* [implied] *Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.* (Emphasis added).

When Congress passes an act terminating a treaty, it *makes a law*, as is illustrated by the Act of July 7, 1798,[3] the first instance of treaty termination by the United States.

It is significant that Thomas Jefferson interpreted the Constitution as placing the power to terminate treaties in Congress and so declared in his "Manual," which as a guide for Congressional procedure persists to this day:

Treaties being declared, equally with the laws of the United States, to be the supreme law of the land, it is understood that an act of the legislature *alone* can declare them infringed and rescinded. This was accordingly the process adopted in the case of France in 1798.

*Jefferson's Manual, Rules and Practices, House of Representatives,* 96th Congress, § 599, at 274 (1979). (Emphasis added).

To the same effect is a statement by Lewis Deschler, who was probably the greatest House Parliamentarian and served from 1928 to 1974, in his eminent work on congressional parliamentary procedure. In outlining the functions of joint resolutions his Procedure states:

"[Joint resolutions] are sometimes used for what may be called incidental legislation, such as extending the national thanks to individuals, welcoming dignitaries, *notice to a foreign government of the abrogation of a treaty*, declarations of military policy, and correction of errors in an existing law.

*Deschler's Procedure,* Ch. 24 § 2, at 246 (1974) (Emphasis added).

---

**3.** The Act of July 7, 1798 provided:

Chap. LXVII.—*An Act to declare the treaties heretofore concluded with France, no longer obligatory on the United States.*

Whereas the treaties concluded between the United States and France have been repeatedly violated on the part of the French government; and the just claims of the United States for reparation of the injuries so committed have been refused, and their attempts to negotiate an amicable adjustment of all complaints between the two nations, have been repelled with indignity: And whereas, under authority of the French government, there is yet pursued against the United States, a system of predatory vio-

lence, infracting the said treaties, and hostile to the rights of a free and independent nation:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the United States are of right freed and exonerated from the stipulations of the treaties, and of the consular convention, heretofore concluded between the United States and France; and that the same shall not henceforth be regarded as legally obligatory on the government or citizens of the United States.

Approved, July 7, 1798.

1 Stat. 578.

On April 20, 1846 Speaker Davis ruled, with respect to the abrogation of the Oregon Treaty, that notice thereof to a foreign government was authorized by joint resolution. V *Hind's Precedents* § 6270 (1907).

In 1829 Chief Justice Marshall interpreted Article II, Section 2 of the Constitution as having the following effect:

"Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice, as *equivalent to an act of the legislature,* whenever it operates of itself, without the aid of any legislative provision."

*Foster v. Neilson,* 2 Pet. (27 U.S.) 253, 314–15, 7 L.Ed. 415 (1829) (Emphasis added), *overruled on other grounds, United States v. Percheman,* 7 Pet. (32 U.S.) 51, 89, 8 L.Ed. 604 (1833).

These interpretations and our historical practice, hereinafter set forth, consider treaties and statutes to be of equal dignity. It is the Supremacy Clause that directs this result because of the necessity that treaties be supreme over state laws the same as Acts of Congress. Hence, the Constitution, acts of Congress and treaties are the "supreme law of the land".

The authority of the landmark decision by Chief Justice Marshall in *Foster* has never been questioned. It is fully consistent with *Foster* and the other reasons discussed herein, to recognize a treaty as requiring a Congressional enactment for its termination.

II *Historical Considerations: Contemporaneous Construction of the Treaty Power*

All parties to this case agree that the express language of the Constitution leaves open the question whether either governmental branch possesses unilateral power to terminate a treaty. Referring to another such constitutional gap, Chief Judge Marshall recognized in *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 4 L.Ed. 579 (1819), that a "principle . . . introduced at a very early period of our history" [as was the Act of Congress terminating the French Treaties by 1 Stat. 578 (1798)] [and] "deliberately established by legislative acts . . ought not to be lightly disregarded." 4 Wheat. at 400, 4 L.Ed. 579.

The Supreme Court has also stated that when acts are "passed shortly after the organization of the government under the Constitution [when] [a]mong the members of that Congress were many who had participated in the convention which framed the Constitution, . . . the act has always been considered, in relation to that instrument, as a contemporaneous exposition of the highest authority." *Patton v. U. S.,* 281 U.S. 276, 300–301, 50 S.Ct. 253, 259, 74 L.Ed. 854 (1930).[4] More recently, *Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491 (1960) stated that precedential value in illustrating the Framers' intent "[obviously] tends to increase in proportion to [the case's] proximity to the Convention of 1787".

In summary, "where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight". *McPherson v. Blacker,* 146 U.S. 1, 27, 13 S.Ct. 3, 7 L.Ed. 869 (1892); *Myers v. U. S.,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) is to the same effect.[5] This prompts a review of the debates

---

**4.** In 1798, when the first instance of U. S. treaty termination was brought about by an Act of Congress, four signers of the Constitution were serving in the House and Senate and other members of Congress had doubtlessly participated in the State ratifying conventions. *See Biographical Directory of the American Congress,* 1774–1971, 5th Congress, at 60 (1971) i. e., Senators Langdon and Pinckney; Representatives Dayton and Baldwin.

**5.** *See also Stuart v. Laird,* 1 Cranch (5 U.S.) 299, 309, 2 L.Ed. 115 (1803); *Martin v. Hunter's*

*Lessee,* 1 Wheat. (14 U.S.) 304, 351, 4 L.Ed. 97 (1816); *Cohens v. Virginia,* 6 Wheat. (19 U.S.) 264, 420, 5 L.Ed. 257 (1821); *Prigg v. Pennsylvania,* 16 Pet. (41 U.S.) 539, 620, 10 L.Ed. 1060 (1842); *Cooley v. Board of Wardens,* 12 How. (53 U.S.) 299, 315, 13 L.Ed. 996 (1851); *Burrow-Giles Lithographing Company v. Sarony,* 111 U.S. 53, 57, 4 S.Ct. 279, 28 L.Ed. 349 (1883); *Ames v. Kansas,* 111 U.S. 449, 463–469, 4 S.Ct. 437, 28 L.Ed. 482 (1883); *The Laura,* 114 U.S. 411, 5 S.Ct. 881, 29 L.Ed. 147 (1884); *Wisconsin v. Pelican Ins. Co.,* 127 U.S. 265, 297, 8 S.Ct. 1370, 32 L.Ed. 329 (1887); *McPher-*

of the constitutional convention, the ratification debates and contemporaneous interpretation of the Constitution. It is from such sources that the most valid construction of the constitutional intent can be gleaned.

Although the Constitution itself is silent on the issue of power to terminate treaties, the congressional role can be inferred from the responsibility granted to Congress in making treaties by the Articles of Confederation, and an early draft of the Constitution. Article IX of the Articles of Confederation placed in "[t]he United States in Congress assembled" the power to enter into treaties. The Framers' vision of a balance of power within our system of government then underwent considerable revision between Nov. 15, 1777, when the Articles of Confederation were ratified, and September 17, 1787, when the Constitution was signed.

In the months prior to the signing, at the Federal Convention, there was extensive discussion concerning proper allocation of the power to make treaties. The August 6, 1787 report of the Committee of Detail to the Constitutional Convention provided in Article IX that "[t]he Senate of the United States shall have the power to make treaties".[6] On August 23, when Article IX was under consideration, James Madison observed "that the Senate represented the States alone, and that for this as well as other obvious reasons it was proper that the President should be *an agent* in treaties."[7] (emphasis added). On September 7th and 8th, the Convention debated the clause requiring two-thirds Senate concurrence, some members favoring a requirement of Senate majority approval, and some favoring deletion of the President from the mak-

ing of peace treaties.[8] The Convention also considered adding the House of Representatives to the treaty making power, "[a]s treaties are to have the operation of *laws*, they ought to have the sanction of laws also."[9] (Emphasis added) But the amendment to have the House participate in the "making" of treaties was defeated and power to advise and concur lodged solely in the Senate branch of the legislature because "[t]he necessity of secrecy in the case of treaties forbade a reference of them to the whole legislature".[10] Since secrecy is less necessary in terminating treaties it provides no basis for omitting the House from the termination process. The majority suggests that this would interfere with a necessity to act "quickly", but treaties and their termination are not a thing of the moment, as the instant case proves.

The Constitution, as adopted after such discussion, granted to the President the power to make treaties, with the advice and consent of the Senate, provided that two-thirds of that body concur. Alexander Hamilton, in the Federalist, emphasized that this unique scheme created a power that was to be jointly held.

> The power in question seems, therefore, to form a distinct department, and to belong, properly, neither to the legislative nor to the executive. The qualities elsewhere detailed as indispensable in the management of foreign negotiations point out the Executive as the most fit agent in those transactions; while the vast importance of the trust, and the operation of treaties as *laws*, plead strongly for the participation of the whole or a portion of the legislative body in the office of making them.

*son v. Blacker*, 146 U.S. 1, 28, 33, 35, 13 S.Ct. 3, 3 L.Ed. 869 (1892); *Knowlton v. Moore*, 178 U.S. 41, 56, 20 S.Ct. 747, 44 L.Ed. 969 (1899); *Fairbank v. United States*, 181 U.S. 283, 308, 21 S.Ct. 648, 45 L.Ed. 862 (1900); *Ex parte Grossman*, 267 U.S. 87, 118, 45 S.Ct. 332, 69 L.Ed. 527 (1924); *Hampton Jr., & Co. v. U. S.*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Inland Waterways Corp. v. Young*, 309 U.S. 517, 60 S.Ct. 646, 84 L.Ed. 901 (1940); *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942).

6. 2 M. Farrand, Records of the Federal Convention 183 (New Haven: rev. ed. 1937).

7. S. Crandall, *Treaties, Their Making and Enforcement*, 43, 44 (2nd ed. Washington, 1916).

8. Crandall, *supra*, 44, 45.

9. James Wilson on Sept. 6, 1787, quoted in Crandall, *supra*, at 48.

10. Roger Sherman on Sept. 6, 1787, quoted in Crandall, *supra*, at 48.

*The history of human conduct does not warrant that exalted opinion of human virtue which would make it wise in a nation to commit interests of so delicate and momentous a kind as those which concern its intercourse with the rest of the world to the sole disposal of a magistrate, created and circumstanced, as would be a president of the United States.*[11]

*The Federalist,* No. 75, of March 26, 1788. (Emphasis added).

James Wilson, one of the most influential members of the Federal Convention, in urging the ratification of the Constitution before the Pennsylvania Convention on Dec. 11, 1787, noted that a shared power would be a safe power.

The President nor the Senate, solely, can complete a treaty; they are checks upon each other, and are so balanced as to produce security to the people.[12]

These statements indicate that while the debate concerning proper placement of the treaty power was thorough and varied, there was never any question about the Senate's integral role in the process of making treaties. Although the power to initiate treaty making was finally lodged by the Constitution in the Presidency, the Senate's participation in concluding binding treaty obligations was made indispensable.

Statements of the Framers of the Constitution, and the early case law, indicate that the Legislature's participation in terminating a treaty was not only considered to be equally indispensable, but logical as well. When he was Vice President, Thomas Jefferson wrote:

Treaties are legislative acts. A treaty is the law of the land. It differs from other laws only as it must have the consent of a foreign nation, being but a contract with respect to that nation . . .. Treaties being declared, equally with the laws

of the United States, to be the supreme law of the land, it is understood that an act of the legislature alone can declare them infringed and rescinded.

Jefferson's *Manual, supra.* This same thought is set forth above.

Although no court has directly addressed the issue of the constitutionality of a unilateral Presidential treaty termination, several courts have addressed the issue tangentially. In *Ware v. Hylton,* 3 Dallas (3 U.S.) 199, 260, 1 L.Ed. 568 (1796), Justice Iredell [13] was asked to find that a treaty with Great Britain had been breached by that party and was therefore unenforceable against U.S. citizens. Justice Iredell declined to hold that the treaty was vacated, stating that this decision "must be grounded on the solemn declaration of congress alone (to whom, I conceive, the authority is intrusted)". This could only be grounded on the necessary and proper clause and Congressional power to legislate.

In the *Amiable Isabella,* 6 Wheat. (19 U.S.) 1, 75, 5 L.Ed. 191 (1821), the Supreme Court through Justice Story said:

.[T]he obligations of the treaty could not be changed or varied but by the same formalities with which they were introduced; or at least by some act of as high an import, and of as unequivocal an authority.

While this statement leans toward Senate participation in treaty termination, it does not rule out termination by Congressional act. It does, however, completely rule out all authority of the President to terminate a treaty *alone.*

Treaties are not supreme over acts of Congress but by the Constitution are made of like obligation as an act of legislation. *Whitney v. Robertson,* 124 U.S. 190, 195, 8 S.Ct. 456, 459, 31 L.Ed. 386 (1888): ("[s]o far as a treaty made by the United States

---

11. The construction given to the Constitution by the authors of the Federalist is entitled to great weight. *Wheeling P&C Transp. Co. v. City of Wheeling,* 99 U.S. 273, 25 L.Ed. 412 (1878); *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 433 (1819).

12. Quoted in S. Crandall, *supra,* at 58.

13. This opinion was delivered while Justice Iredell was sitting as a circuit judge and reprinted in *Ware v. Hylton.* Prior to his appointment to the Bench, Iredell served to explain the Constitution to the North Carolina Convention.

with any foreign nation can be the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or *repeal*." (Emphasis added)); *Boudinot v. U. S. (Cherokee Tobacco),* 11 Wall. (78 U.S.) 616, 620–621, 20 L.Ed. 227 (1870) ("A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty.")[14]

By giving treaties the status of supreme law of the land, equivalent to acts of Congress,[15] the Framers rectified one of the weaknesses of the Articles of Confederation.[16] Although Congress had been delegated the treaty making power by that instrument, Congress had to depend upon the ratification and cooperation of state legislatures, which was not always forthcoming.

The equivalence of statutes and treaties as law of the land is of tremendous importance to this case. Because the Constitution makes treaties the law of the land, courts have consistently held that Congress has the right to amend or repeal treaties, as it has the power to amend or repeal statutes. An 1854 Opinion of the Attorney General, 6 Ops.Atty.Gen. 291, recognized Congressional power to repeal treaties by act of Congress, and was followed by judicial concurrence. *Taylor v. Morton,* 23 Fed. Cas.P. 784, No. 13,799 (C.C.D.Mass.1855). *See also The Cherokee Tobacco,* 11 Wall. (78 U.S.) 616, 20 L.Ed. 227 (1871); *United States v. Forty-Three Gallons of Whiskey,* 108 U.S. 491, 496, 2 S.Ct. 906, 27 L.Ed. 803 (1883); *The Chinese Exclusion Case,* 130 U.S. 581, 600, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Fong Yue Ting v. United States,* 149 U.S. 698, 721, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). "Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate." *La Abra Silver Mining Co. v. United States,* 175 U.S. 423, 460, 20 S.Ct. 168, 181, 44 L.Ed. 223 (1899).

In *Van Der Wyde v. Ocean Transport Co.,* 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515 (1935), the Supreme Court upheld the constitutionality of treaty *termination* proce-

---

**14.** More recently, the Court in *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed.2d 1632 (1947), quoted with approval language of then Judge Cardozo in *Techt v. Hughes,* 229 N.Y. 222, 243, 128 N.E. 185, 192 (1920), *cert. denied,* 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920):
> [T]he President and Senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts.

And in *Teti v. Consolidated Coal Co.,* 217 F. 443, 450 (D.C.N.Y.1914), the court stated:
> This treaty is the supreme law of the land, which Congress alone may abrogate . . .

**15.** *See Foster v. Neilson, supra.*
> In the passage quoted, *supra,* Marshall is referring to the distinction between self-executing treaties, which need no legislative implementation to become the law of the land, and non-self-executing treaties, which require implementing legislation. The District Court below found that Article V, the Treaty's key provision, was self-executing and that Article VII, which was not, had been executed by Congressional appropriation. Hence, the Treaty is the law of the land.
> For another statement by Chief Judge Marshall regarding treaties as law of the land, *see*

*United States v. Schooner Peggy,* 1 Cr. (5 U.S.) 103, 110, 2 L.Ed. 49 (1801).

**16.** Article IX of the Articles of Confederation granted the treaty making power to Congress and:
> provided that no treaty of commerce shall be made whereby the legislative power of the respective states shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever . . . .

After the Constitution had replaced the Articles of Confederation, Mr. Justice Bradley noted the rectification of the problems sighted by Hamilton:
> The United States is not only a . . . government, but it is a National government. It is invested with power over all the foreign relations of the country, war, peace and negotiations with other nations; all of which are forbid. . . .den to the State governments.

*Knox v. Lee,* 12 Wall. (79 U.S.) 457, 555, 20 L.Ed. 287.

dure whereby Congress "requested and directed" the President, by its Seamen's Act of March 4, 1915, to give notice of the termination of treaty provisions inconsistent with the Act. The Supreme Court held: "From every point of view, it was incumbent upon the President, charged with the conduct of negotiations with foreign governments and also with the duty to take care that the laws of the United States are faithfully executed, to reach a conclusion as to the inconsistency between the provisions of the treaty and the provisions of the new law." 297 U.S. at 118, 56 S.Ct. at 394.

In the years since the passage of the Constitution, the Framers' understanding that treaty termination was to be a shared power has been more than merely voiced, it has been the consistent practice. The following sections illustrate this pervasive Congressional participation in treaty terminations, and *prove groundless* the President's claimed instances of unilateral termination.

## III *The Historical Practice of Treaty Termination*

### A. *The Termination of Treaties by Congress*

The President's review of the historical practice of treaty termination stands in direct conflict with that of Appellees. The President's brief asserts:

> There have been 26 instances of treaty termination actions taken by the President, App. 405–39, 683–98. In 13 of those instances the President acted without the participation of Congress . . . 11 of the 13 cases of presidential termination have occurred since the end of World War I.

Even accepting this statement as a correct description of the historical practice, on its face it admits that there have been 13 instances where the President acted *with* the participation of Congress. Appellees' position, however, as expressed in the sworn declaration of J. Terry Emerson, which is part of the record of this case, claims many more instances of Congressional participation in treaty termination:

> 3. I have identified at least 52 separate treaties or provisions thereof which have been terminated with legislative authority. Four of these 52 have been terminated with legislative approval granted after Presidential request was made for such authority through the mechanism of the Presidential Message . . . The remaining 48 have been terminated with legislative authority in the manner [indicated in the declaration].

Filed October 9, 1979 in Civil Action No. 78–2412. The declaration then sets forth numerous instances in which Congress terminated or authorized the termination of treaties.

Argument can arise over the exact number of such instances because some Congressional resolutions authorized or directed the termination of several treaties. Hence, I will not attempt to calculate the exact number of treaties in which the Congress participated. It is worthy of note, however, that Judge Gasch, in the District Court, concluded that the "great majority of the historical precedents involve some form of mutual action." District Court Order and Memorandum of October 18, 1979, Appendix 866, 885. My review of treaties terminated by this country bears out Judge Gasch's conclusion and convinces me that Congressional participation in termination has been the overwhelming historical practice. Practice may not make perfect a constitutional power. Yet a prevailing practice, especially when begun in the light provided by the dawn of the Constitution, emanates a precedential aura of constitutional significance. The prevailing practice in treaty termination during the era of the Framers of the Constitution, and in the generations thereafter, was the product of the Framers' conception of a balanced federal government, as expressed specifically in the *sharing* of the treaty power among the legislative and executive branches.

The first treaty terminated by the United States was abrogated by an Act of *Congress* of July 7, 1798, 1 Stat. 578. By this act, entitled "An Act to Declare the Treaties Heretofore Concluded with France No Longer Obligatory on the United States", Congress pronounced the United States

freed and exonerated from Treaties of 1778 with France. As this act occurred just slightly less than ten years after ratification of the Constitution on September 13, 1788, it can be viewed as a reasonably contemporaneous construction that treaty termination was a legislative act. The act is set forth in its entirety in note 3, *supra.*

The next instance of treaty termination occurred in 1846, when President Polk specifically requested that Congress legislatively approve his authority to give notice under the terms of the Oregon Territory Treaty with Great Britain.[17] By Joint Resolution of April 27, 1846, Congress then authorized the President to notify the British Government of the abrogation of the Convention of August 6, 1827.[18]

I will not analyze the circumstances of each treaty termination. Instead I have set forth in footnote 19 a significant part of the title of the relevant resolutions or the body thereof, to make clear that in those instances, Congressional action effectively terminated, or was the cause of terminating, the treaty or treaties in question.[19]

It should be emphasized here, however, that President Polk was not alone among

17. *See* Presidential message of Dec. 2, 1845; J. Richardson, *A Compilation of the Messages and Papers of the President*, 2235, 2242–2245 (1897).

18. "As the President himself had requested the resolution, the episode supports the theory that international conventions to which the United States is a party, even those terminable on notice, are terminable only by act of Congress."
S. Crandall, *Treaties, Their Making and Enforcement* 458–459 (2nd ed. 1916).

19. (a) Joint Resolution of April 27, 1846 concerning the Oregon Territory.
*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That the President of the United States be, and he is hereby, *authorized*, at his discretion, to give to the government of Great Britain the notice required by the second article of the said convention of the sixth of August, eighteen hundred and twenty-seven, for the *abrogation* of the same.
Approved, April 27, 1846.
9 Stat. 109–110. (Emphasis is added here and below.)
(b) January 18, 1865.
*Joint Resolution providing for the Termination of the Reciprocity Treaty of fifth June, eighteen hundred and fifty-four, between the United States and Great Britain.*
Whereas it is provided in the Reciprocity Treaty concluded at Washington, the fifth of June, eighteen hundred and fifty-four, between the United States, of the one part, and the United Kingdom of Great Britain and Ireland, of the other part, that this treaty "shall remain in force for ten years from the date at which it may come into operation, and further until the expiration of twelve months after either of the high contracting parties shall give notice to the other of its wish to terminate the same;" and whereas it appears, by a proclamation of the President of the United States, bearing date sixteenth March, eighteen hundred and fifty-five, that the treaty came into operation on that day; and whereas, further, it is no longer for the interests of the United States to continue the same in force: Therefore,
*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That notice be given of the *termination* of the Reciprocity Treaty, according to the provision therein contained for the termination of the same; and the President of the United States is hereby *charged* with the communication of such notice to the government of the United Kingdom of Great Britain and Ireland.
Approved, January 18, 1865.
13 Stat. 566. The one year termination clause above is similar to the termination clause in the Taiwan Treaty.
(c) June 17, 1874.
Joint resolution providing for the termination of the treaty between the United States and His Majesty the King of the Belgians, concluded at Washington, July seventeenth, eighteen hundred and fifty-eight.
\* \* \* \* \* \*
*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That notice be given of the termination of said treaty according to the provisions of the said seventeenth article thereof for such termination, and the President of the United States is hereby authorized to communicate such notice to the Government of the Kingdom of Belgium.
Approved, June 17, 1874.
18 Stat. 287.
(d) March 3, 1883.
Joint resolution providing for the *termination* of articles numbered eighteen to twenty-five, inclusive, and article numbered thirty of the treaty between the United States of America and Her Britannic Majesty, concluded at Washington, May eighth, eighteen hundred and seventy-one.
\* \* \* \* \* \*
Sec. 2. That the President be, and he hereby is, directed to give and communicate to

the Government of Her Britanic Majesty such notice of such *termination* on the first day of July, anno Domini eighteen hundred and eighty-three, or as soon thereafter as may be.

Sec. 3. That on and after the expiration of the two year's time required by said treaty, each and every of said articles shall be deemed and held to have *expired* and be of no force and effect, and that every department of the Government of the United States shall execute the laws of the United States (in the premises,) in the same manner and to the same effect as if said articles had never been in force; and the act of Congress approved March first, anno Domini eighteen hundred and seventy-three, entitled "An act to carry into effect the provisions of the treaty between the United States and Great Britain, signed in the city of Washington the eighth day of May, eighteen hundred and seventy-one, relating to the *fisheries*," so far as it relates to the articles of said treaty so to be terminated shall be and stand repealed and be of no force on and after the time of the expiration of said two years.

Approved, March 3, 1883.

22 Stat. 641.

(e) December 21, 1911.

Joint Resolution Providing for the *termination* of the treaty of eighteen hundred and thirty-two between the United States and Russia.

\* \* \* \* \* \*

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the notice thus given by the President of the United States to the Government of the Empire of Russia to *terminate* said treaty in accordance with the terms of the treaty is hereby adopted and ratified.

Approved, December 21, 1911.

37 Stat. 627. This ratified an "official notification" by the President "announcing intention to terminate" one year hence.

(f) March 4, 1915.

CHAP. 153.—An Act To promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to *secure the abrogation of treaty provisions in relation thereto*; and to promote safety at sea.

\* \* \* \* \* \*

Sec. 16. That in the judgment of Congress articles in treaties and conventions of the United States, in so far as they provide for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of the United States in foreign countries, and for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and the Territories and possessions thereof, and for the cooperation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment and any other treaty provision in conflict with the provisions of this Act, ought to be terminated, and to this end the President be, and he is hereby, *requested and directed*, within ninety days after the passage of this Act, to give notice to the several Governments, respectively, that so much as hereinbefore described of all such treaties and conventions between the United States and foreign Governments will *terminate* on the expiration of such periods after notices have been given as may be required in such treaties and conventions.

38 Stat. 1164, 1165. (Emphasis added).

(g) May 26, 1921.

To the Senate:

With the view to receiving the advice and consent of the Senate to the action desired, I transmit herewith a report by the Secretary of State, with an accompanying letter from the Secretary of the Treasury recommending that the international sanitary convention, signed at Paris on December 3, 1903, be *denounced* on the part of the United States for the reason that its provisions are inimical to the interests of the United States and because of the failure of the signatory Government to observe at least one of the convention's important stipulations.

Woodrow Wilson.

Whereas the President, under date of May 17, 1920, transmitted a message to the Senate with a view to receiving the advice and consent thereof to the denunciation of the international sanitary convention signed at Paris December 3, 1903, and proclaimed May 18, 1907: Be it

*Resolved (two-thirds of the Senators present concurring),* That the Senate *advise and consent to the denunciation* of the said international sanitary convention, in conformity with the reservation with respect to denunciation contained in the procès verbal of the deposit of ratifications thereof, with regard to the powers which are not parties to the international sanitary convention, signed at Paris, January 17, 1912, and proclaimed December 11, 1920.

61 Cong.Rec. 1793. It is highly significant that President Wilson, a great student of Constitutional and international law, interpreted the Constitution as requiring the advice and consent of the Senate to the termination of this treaty.

(h) September 4, 1961.

Sec. 620. Prohibitions Against Furnishing Assistance to Cuba and Certain Other Countries.—(a) No assistance shall be furnished under this Act to the present government of Cuba. As an additional means of implementing and carrying into effect the policy of the preceding sentence, the *President is authorized to establish and maintain a total embargo upon all trade between the United States and Cuba.*

Presidents in his recognition of Congress' role in treaty termination. President Grant in a message to Congress on June 20, 1876, inquired whether he should regard the extradition article of the British Treaty of 1842 as void on "account of certain acts of the British government." His message said *"it is for the wisdom of Congress to determine whether the article of the treaty relating to extradition is to be any longer regarded as obligatory on the Government of the United States or as forming part of the supreme law of the land."* He went on to point out that if the attitude of the British Government did not change, he would not extradite any person "without an expression of the wish of Congress." 9 J. Richardson, *Messages and Papers of the Presidents* 4324, 4327 (Washington; 1897).

With respect to the Treaty of 1868 with China, Congress in 1879 passed a resolution requiring President Hayes to abrogate Articles V and VI of the Treaty. The President vetoed the Resolution (as is his right) on the ground that "modifying an existing treaty whether by adding or striking out provisions is a part of the treaty-making power under the Constitution." In the same message he admitted *"the authority of Congress to terminate a treaty with a foreign power by expressing the will of the nation no longer to adhere to it is as free from controversy under our Constitution as is the further proposition that the power of making new treaties or modifying existing treaties is not lodged by the Constitution in Congress but in the President by and with the advice and consent of the Senate."* Id. 4466, 4470–71. (Emphasis added).

75 Stat. 444–445. Such Congressional authorization for an embargo obviously had the effect of countermanding all trade with Cuba.
(i) April 13, 1976.
SEC. 202. INTERNATIONAL FISHERY AGREEMENTS.
(a) Negotiations.—The Secretary of State—
(1) shall renegotiate treaties as provided for in subsection (b);
(2) shall negotiate governing international fishery agreements described in section 201(c);
(3) may negotiate boundary agreements as provided for in subsection (d);
(4) shall, upon the request of and in cooperation with the Secretary, initiate and conduct negotiations for the purpose of entering into international fishery agreements—
(A) which allow fishing vessels of the United States equitable access to fish over which foreign nations assert exclusive fishery management authority, and
(B) which provide for the conservation and management of anadromous species and highly migratory species; and
(5) may enter into such other negotiations, not prohibited by subsection (c), as may be necessary and appropriate to further the purposes, policy, and provisions of this Act.
(b) Treaty Renegotiation.—The Secretary of State, in cooperation with the Secretary, shall initiate, promptly after the date of enactment of this Act, the renegotiation of any treaty which pertains to fishing within the fishery conservation zone (or within the area that will constitute such zone after February 28, 1977), or for anadromous species or Continental Shelf fishery resources beyond such zone or area, and which is in any manner inconsistent with the purposes, policy, or provisions of this Act, in order to conform such treaty to such purposes, policy, and provisions. It is the sense of Congress that the United States shall *withdraw from any such treaty*, in accordance with its provisions, if such treaty is not so renegotiated within a reasonable period of time after such date of enactment.

\* \* \* \* \* \*

(d) Boundary Negotiations.—The Secretary of State, in cooperation with the Secretary, may initiate and conduct negotiations with any adjacent or opposite foreign nation to establish the boundaries of the fishery conservation zone of the United States in relation to any such nation.
(e) Nonrecognition.—It is the sense of the Congress that the United States Government shall not recognize the claim of any foreign nation to a fishery conservation zone (or the equivalent) beyond such nation's territorial sea, to the extent that such sea is recognized by the United States, if such nation—
(1) fails to consider and take into account traditional fishing activity of fishing vessels of the United States;
(2) fails to recognize and accept that highly migratory species are to be managed by applicable international fishery agreements, whether or not such nation is a party to any such agreement; or
(3) imposes on fishing vessels of the United States any conditions or restrictions which are unrelated to fishery conservation and management.
16 U.S.C. § 1822, 90 Stat. 339–340. The Congressional direction with respect to fishing treaties is here apparent.

B. *The President's Claim of Absolute Power to Terminate Treaties.*

The President contends: "Past Practice of Treaty Termination confirms the President's Power to Act Alone", Appellant's Br. 53. This claim of *sole* Presidential power is *not* supported by the examples set forth above. In support of his contention, however, he makes as his principal argument that "[i]n 13 of those [26] instances [of treaty terminations], the President acted *without the participation of Congress . .* " Appellant's Br. 54–55. (Emphasis added).

Let us look at the record. Analysis of these 13 instances undermines the President's claim that he has the absolute power to terminate treaties *alone.* All except one of the 13 following instances are also discussed and supported with record citations in, "The Abuse of History: A Refutation of the State Department Analysis of Alleged Instances of Independent Presidential Treaty Termination", by Jonathan York Thomas, (hereafter Thomas), a law review article to be published in 6 *Yale Studies in World Public Order* (Fall 1979).

(1) The Netherlands Treaty of 1782—In 1815, President Madison exchanged correspondence with the Netherlands, which has been construed by the United States as establishing that the 1782 Treaty of Amity and Commerce between the two countries had been annulled.

The government of the "Netherlands" that entered into the Treaty of 1782 went out of existence. From 1795 to 1813 it was succeeded by several other governments, one of which was subsequently incorporated into the French Empire of Napoleon. Thus, the unsettled conditions in Europe had effectively annulled the treaty.[20] Under such circumstances, in 1815 when President Madison, without Congressional authorization, declared the 1782 treaty annulled, he merely gave formal recognition to the recognized fact that the treaty was inoperative and that the other contracting party had ceased to exist. Authorities on international law recognized that "as a result of the changes in the state of Europe effected by the wars of Napoleon, *all* the treaties of the United States with European powers were considered as *terminated*, excepting only one with Spain of 1795 . . . " [5 *Moore, Dig.Int.L.*] 338. *Bouvier's Law Dictionary* 2820 (Unabridged, 5th Rev., 1914) (Emphasis added); *Black's Law Dictionary* 1432 (4th Ed., 1968).

(2) The 1850 Swiss Treaty—In 1899, President McKinley gave notice to the Swiss Government of the United States' intent "to arrest the operations" of certain articles of the 1850 Convention of Friendship, Commerce, and Extradition with Switzerland [which gave most favored nation treatment to that country.]

In the Tariff Act of July 24, 1897, Congress authorized the President to negotiate reciprocity agreements with other countries in favor of the products of the United States. Shortly thereafter, France and the United States concluded a reciprocal agreement. Switzerland then demanded equal treatment under the most favored nations provisions of its 1850 treaty. It thus became apparent that the 1897 Act conflicted with the 1850 Treaty; since the Tariff Act of 1897 was later in time it became the law of the land, superseding the 1850 Treaty. *See Van Der Weyde v. Ocean Transport Co.*, 297 U.S. 114, 116, 118, 56 S.Ct. 392, 80 L.Ed. 515 (1936). Under such circumstances, when Switzerland refused to negotiate a reciprocity agreement, the President gave the one year notice of termination provided by the treaty. This is thus an instance where a subsequent Act of Congress effectively caused the termination of a treaty, and the President communicated a notice of termination, a purely ministerial act. It cannot be considered as an instance where the President acted "without the participation of Congress."

(3) The Belgian Congo Treaty of 1891—In 1920, President Wilson by agreement, terminated the 1891 Treaty of Amity, Commerce, and Navigation with Belgium concerning the Congo.

In the Seaman's Act of 1915, 38 Stat. 1164, Congress directed the President to

**20.** *Foreign Relations of the United States* (1873), Part 2, at 721–722.

terminate *conflicting provisions* in existing treaties. Belgium was one of the countries so notified because of its relation to the Kongo (Congo). In response, Belgium replied that it considered it to be the best procedure to terminate the entire treaty and asked our Consul to request the United States to make formal acknowledgement of such "denunciation." [21] It was thus Congress that directed the President to terminate the provisions conflicting with the Seaman's Act. The President did not terminate the treaty; the President merely recognized the existence of a condition brought about by action of the Belgian Government.

(4) The 1925 Mexican Treaty—In 1927, President Coolidge gave notice of termination of the Treaty of 1925 with Mexico that was designed to prevent smuggling between the two nations.

This treaty, proclaimed on March 18, 1926, was terminated by the President on March 21, 1927 because of the deterioration of relations with Mexico over its expropriation of property of United States citizens without compensation. Under such circumstances the President considered that our enforcement of a smuggling treaty with a nation with which we had no commercial treaty might operate in a discriminatory manner.[22] The President had the tacit approval of influential Congressmen who expressed their views, as is evidenced by frequent criticism of the Mexican government. Since the treaty had only a narrow scope and because the principal beneficiary, so far as we were concerned, was a foreign government, the legality of the termination was never tested.

(5) The National Recovery Act—In 1933, President Roosevelt delivered to the League of Nations a declaration of the United States' withdrawal from the 1927 multilateral Convention for the Abolition of Import and Export Prohibition and Restrictions.

In 1933 as part of the National Industrial Recovery Act (NRA) the Congress authorized the President to license imports and impose embargoes [23] that were in violation of the 1927 Multilateral Tariff Convention.[24] The NRA specifically directed the President to restrict the importation of any article that might "render ineffective or seriously . . . endanger the maintenance of any [NRA] code or agreement . . .[25] only

---

**21.** *Foreign Relations of the United States* 34 (1916).

**22.** III *Foreign Relations of the United States* 230–231 (1927).

**23.** 48 Stat. 195.

**24.** Cf. 46 Stat. 2461 et seq.

**25.** The Act of June 16, 1933 provided:

Section 3. (e) On his own motion, or if any labor organization, or any trade or industrial organization, association, or group, which has complied with the provisions of this title, shall make complaint to the President that any article or articles are being imported into the United States in substantial quantities or increasing ratio to domestic production of any competitive article or articles and on such terms or under such conditions as to render ineffective or seriously to endanger the maintenance of any code or agreement under this title, the President may cause an immediate investigation to be made by the United States Tariff Commission, which shall give precedence to investigations under this subsection, and if, after such investigation and such public notice and hearing as he shall specify, *the President* shall determine the existence of such facts, he *shall*, in order to effectuate the policy of this title, *direct that the article or articles concerned shall be permitted entry into the United States only upon such terms and conditions and subject to the payment of such fees and to such limitations in the total quantity which may be imported (in the course of any specified period of periods) as he shall find it necessary to prescribe in order that the entry thereof shall not render or tend to render ineffective any code or agreement made under this title.* In order to enforce any limitations imposed on the total quantity of imports, in any specified period or periods, of any article or articles under this subsection, the President may forbid the importation of such article or articles unless the importer shall have first obtained from the Secretary of the Treasury a license pursuant to such regulations as the President may prescribe. Upon information of any action by the President under this subsection, the Secretary of the Treasury shall, through the proper officers, permit entry of the article or articles specified only upon such terms and conditions and subject to such fees, to such limitations in the quantity which may be imported, and to such requirements of license, as the

upon such terms and conditions and subject to the payment of such fees and to such limitations in the total quantity . . . as he shall find it necessary to prescribe . . . The decision of the President as to facts shall be conclusive . . ." [26] Thereafter, giving various reasons, including the fact that all except seven of twenty-nine countries had withdrawn from the treaty, the President authorized the giving of our notice of withdrawal.

In light of the broad powers given the President in Section 3(e) of the National Industrial Recovery Act, *supra*, the notice to terminate the treaty could not be said to have been unauthorized by Congress. It had by a Congressional Act, later declared to be unconstitutional,[27] given to the President practically complete control over "imports" that rendered ineffective any of the NRA codes or agreements. Following the decision of the Supreme Court declaring Section 3 of the NRA unconstitutional, Congress repealed the unlawful delegation of authority to the President and provided for the expiration on April 1, 1936 of Title I of the National Industrial Recovery Act of June 14, 1935.[28]

(6) The 1931 Greek Treaty—In 1933, President Roosevelt gave notice of termination (which was withdrawn subsequently) of the 1931 Treaty of Extradition with Greece.

President Roosevelt's *threat* to terminate this treaty because Greece had refused to extradite Samuel Insull first on (1) state, and then subsequently on (2) federal charges, was *withdrawn* and never carried out;[29] it consequently furnishes no support for the President's claim that he is vested with such constitutional power. Moreover, the basis of President Roosevelt's threat was not that he had authority to *initiate* termination of a valid treaty, but rather that because Greece had violated the terms of the treaty it thereby became voidable and he had authority to so declare. This is a proper construction of Presidential authority, *Charlton v. Kelly*, 229 U.S. 447, 473–476, 33 S.Ct. 945, 57 L.Ed. 1274 (1913) and has furnished the basis for several terminations. *However, the discretionary authority in the President to declare a treaty abrogated, one that has become voidable because the other party violated it, does not furnish any support for the claim that a President acting without Congress can abrogate a treaty that is valid and subsisting, and the supreme law of the land, and which has not in any way been violated by the other party.*[30]

(7) The 1871 Treaty with Italy—In 1936, President Roosevelt approved a protocol (deemed to be notice of termination) terminating the 1871 Treaty of Commerce and Navigation with Italy.

The basis of this termination was that Italy had already violated the provisions of the 1871 Treaty by discriminating against American goods; Congress had *authorized* the President to proclaim modified or additional import restrictions because of discriminatory treatment of American com-

President shall have directed. The decision of the President as to facts shall be conclusive. Any condition or limitation of entry under this subsection shall continue in effect until the President shall find and inform the Secretary of the Treasury that the conditions which led to the imposition of such condition or limitation upon entry no longer exists." (sic) 48 Stat. 196–197. (Emphasis added).

**26.** *Id.*

**27.** *Schecter Corp. v. U. S.*, 295 U.S. 495, 55 S.Ct. 651, 79 L.Ed. 1676 (1935). Section 3, *supra*, was held to be utterly inconsistent with constitutional prerogatives.

**28.** 49 Stat. 375.

**29.** II *Foreign Relations of the United States* 566 (1933); 5 Hackworth 315.

**30.** Incidentally, Greece refused to extradite Insull because it claimed the proffered proof of his alleged crime did not constitute a *prima facie* showing of the requisite criminal intent that our law required. The case developed in the early New Deal days as part of a vendetta against Public Utilities Holding Companies in which Insull was a leading figure. Insull subsequently returned to this country in 1934, was tried—and *acquitted on all charges*. V *Encyclopedia Britannica*, Micropaeida. Samuel Insull, at 373 (1974).

merce.[31] Since this is another instance where Congress had authorized the President to take the action he did,[32] it cannot be said that the President acted without the participation of Congress.

(8) The 1911 Japanese Treaty—In 1939, President Roosevelt gave notice of termination of the 1911 Treaty of Commerce and Navigation with Japan.

This six months notice of termination presents another situation in which the President acted because this nation considered that the other party to the treaty was in breach. Japan, by the discriminatory trade practices it imposed in North China following its military occupation of that area, violated the Treaty of 1911 [33] and the Nine Nations Treaty of February 6, 1922,[34] providing for the "Open Door" in China. These trade restrictions had resulted in a substantial discrimination against American commerce with that area and given rise to a claimed violation of America's treaty right to most-favored-nation status.[35] The factual situation is fully set forth in diplomatic correspondence and resolutions of Senators who were influential and informed in foreign affairs.[36]

(9) The 1924 Pan American Trademark Treaty—In 1944, President Roosevelt gave notice of denunciation of the 1929 Protocol to the Inter American Convention for Trademark and Commercial Protection.

This 1944 notice [37] with respect to the Pan American Trademark Treaty,[38] according to the contemporary correspondence, was based on the fact that it had been ineffective [39] because of substantial failures by other parties to comply with its terms. We considered that such failures to conform to the treaty did not justify our continuing annual *financial contribution* to the Bureau purportedly administering the treaty. This is *not* a case of treaty termination. As Secretary of State Cordell Hull stated in his

---

**31.** The applicable provision of the applicable Trade Agreement's Act provided:
Sec. 350. (a) For the purpose of expanding foreign markets for the products of the United States . . . [and] developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other important restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—
"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and
"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free list. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: Provided, That the President may suspend the application to articles the growth,

produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part."
48 Stat. 943–944.

**32.** II Foreign Relations of the United States, 356 (1936).

**33.** 9 Bevans 416 (1974).

**34.** III *Treaties between U. S. and Others*, 1910–1923, Government Printing Office 3122–3124 (1923).

**35.** NIS, *supra*.

**36.** III *Foreign Relations of the United States* 375, 389, 391 (1939), 84 *Cong.Rec.* 9341 (Senator Vandenburg); 10751 (Senator Pittman); 10783 (Senator Schwellenbach). Representative Stern also introduced a Resolution, 84 *Cong.Rec.* 9544.

**37.** U.S. Dept. of State Bulletin # 11, at 442 (1944).

**38.** 2 Bevans 751.

**39.** State Dept. 710. D4/9–2944, Sept. 29, 1944.

September 29, 1944 letter to American Diplomatic Officers in the other American Republics "this Government is *not denouncing*" the Trademark Treaty but was merely "withdraw[ing] its support from the Trade Mark Bureau."

(10) The 1923 Nomenclature Treaty—In 1954, President Eisenhower gave notice of withdrawal from the 1923 Convention on Uniformity of Nomenclature for the Classification of Merchandise.

By this 1923 Treaty the signatory nations had agreed to use the 1913 Brussels nomenclature for the classification of merchandise; by 1950, however, such nomenclature was outdated and the United Nations Economic and Social Council urged nations to use the subsequently developed Standard Classification. Thereafter, in 1954 by resolution the Tenth Inter-American Conference of American States requested the "ratifying Governments" of the 1923 Treaty to consider withdrawing from the said Treaty so that all parties could legally abandon it and replace it with the new Standard and International Trade classification of the United Nations.[40] Hence, the United States gave notice of withdrawal "in accordance with the . . . recommendation of the Inter-American Conference." [41]

This withdrawal was merely a recognition that the substantial change in facts and conditions had *terminated* the obligation of the treaty. In such circumstances the principle applied is known as *rebus sic stantibus*.

"[This is a] name given to a tacit condition, said to attach to all treaties, that they shall cease to be obligatory so soon as the state of facts and conditions upon which they were founded has substantially changed. Taylor, Int. L. § 394; 1 Oppenheim, Int. L. 550; Grotius, ch. XVI, § XXV; Vattel B. 2, c. 13, § 200; Hall, Int. L. § 116; Hershey, Int. Pub. L. 319.

2 *Bouvier's Law Dictionary* 2820 (Unabridged 3d Rev., 1914); *Black's Law Dictionary* 1432 (4th Ed., 1968).

This is yet another instance where the President was simply acting formally to recognize the prior practical termination of a treaty.

(11) The 1865 Cape Spartel Light Treaty—Eisenhower Agreement in 1958 to Terminate the Multilateral Convention of 1865 on the Cape Spartel Light.

On January 17, 1958, the Government of the King of Morocco informed the parties to the 1865 multilateral convention on the Cape Spartel Light (1 Bevans 14) at the Strait of Gibraltar of its intention "to *terminate* that Convention and to assume the management and operation of the Cape Spartel Light." (TIAS 4029). Thereafter, on March 31, 1958, the respective parties met at Tangier, agreed to the King's request and entered into an Executive Agreement setting forth "the terms and conditions of that transfer." This executive agreement formally terminated the Convention of May 31, 1865 and Morocco recovered all the movable and immovable property it "had placed at the disposal of the International Commission", including the "paintings, engravings, models and miscellaneous objects . . . in the light house museum." (TIAS 4029).

Since Morocco had notified the twelve nations forming the International Commission of its intent to *terminate* the treaty, the subsequent Executive Agreement with the countries forming the International Commission merely formalized Morocco's recovery of its own property pursuant to Morocco's own notice of termination.

(12) The 1920 Cuban Treaty—In 1962, President Kennedy gave notice of termination of the 1920 Convention on Commercial Relations with Cuba.

The 1902 Commercial Treaty with Cuba [42] was terminated on August 21, 1962 by Pres-

---

**40.** Hansel, U.S. Archives 74 D 431; Thomas.

**41.** Hansel, Memorandum for State Department, "Materials on Treaty Termination" 419–420; Thomas.

**42.** 6 Bevans 1106.

ident Kennedy, acting in accordance with the following Congressional authorizations:

Sec. 620. PROHIBITIONS AGAINST FURNISHING ASSISTANCE TO CUBA AND CERTAIN OTHER COUNTRIES. —(a) No assistance shall be furnished under this Act to the present government of Cuba. As an additional means of implementing and carrying into effect the policy of the preceding sentence, the President is authorized to establish and maintain a total embargo upon all trade between the United States and Cuba.

Act of Sept. 4, 1961, P.L. 87–195, 75 Stat. 444–445. The Export Control Act of 1949, 63 Stat. 7, et seq., also authorized such action. Termination was in accordance with a Resolution [43] adopted under the Inter-American Treaty of Reciprocal Assistance, September 2, 1947, 62 Stat. 1699–1704.

In view of the above Congressional legislation it can hardly be said that the President acted "without the participation of Congress", Gov't Br. 56.

(13) The 1929 Warsaw Treaty—In 1965, President Johnson gave notice of denunciation, subsequently withdrawn, of the 1929 Warsaw Convention concerning liability for damages suffered in international air travel.

This notice was given as part of the negotiations with airlines and other nations in 1965 to raise the maximum limit of recovery for damages suffered in international flight from the $8,300 provided by the Warsaw Convention in 1929, to a more realistic figure. After lengthy negotiations the amount was raised to $75,000 [44] and the denunciation was withdrawn.[45] The President issued his notice after the Chairman of the Senate Foreign Relations Committee had indicated the Committee had no objection to the President's giving such notice.[46] However, it was obviously a negotiating notice, as it stated when it was issued that it would be "withdrawn" if there were a reasonable prospect of international agreement on new limits on liability.[47] Principal-

ly, however, this cannot provide a precedent for unilateral presidential termination because the notice was withdrawn and no treaty was terminated pursuant to his notice. Thus no case developed that might have been used to adjudicate the legality of the President's action had he allowed his notice to achieve its final effect.

C. *The Historical Position of Congress and Congressmen.*

In addition to the President's contention that his office has in 13 instances terminated treaties without the participation of Congress, the President further attempts to enlarge the effect of that contention by asserting: "[s]ignificantly, in none of the 13 cases where the Executive acted alone was the action *subject to congressional challenge on constitutional grounds*, or in any way deemed ineffective." A footnote to his brief adds:

[40] The Congress has never challenged the President's power to terminate treaties unilaterally in the modern era. This has been true even when there has been extensive discussion of the particular Presidential initiative in Congress. *See e. g.* the debate regarding President Johnson's Notice of Denunciation of the Warsaw Convention (later withdrawn), App. 436–38; Hearings of the Senate Foreign Relations Committee on the Hague Protocol of the Warsaw Convention, 89th Cong., 1st Sess., Pt. 2, at 42 (1965). [Actually President's notification was more of a negotiating tool; comment added].

Congress' action with respect to the treaty * termination here is revealing. While individual Senators and Congressmen have challenged the President's 1978 termination action, the Senate and House have avoided a specific vote on the propriety of the President's notice of termination. See pp. 9–11; 31–33, *supra.*

Appellant's Br., 55, n. 40.

Even if the above contention were true, and the preceding analysis shows it is not, mis-

43. Thomas.

44. 53 U.S. Dept. of State Bulletin 924 (1965).

45. Thomas, n. 105.

46. Thomas, n. 101.

47. 53 U.S. Dept. of State Bulletin 924 (1965).

use of power does not legitimize that abuse, or give birth to a constitutional right. As can be noted from the analysis of the 13 alleged instances of claimed independent Presidential termination, Congress did participate in many of the terminations, and Presidential action in most of those cases was relatively innocuous and non-controversial. In the past the disinclination of Congress, or its individual members, to actively oppose the President's terminations may lie in the financially discouraging fact that any Congressman who opposed the President's action would have to pay his own legal expenses. These would be considerable, as he would have to surmount a heavy legal barrage from the Department of Justice, couched in claims that Congressmen have no standing, (as here, Gov't Br. 18–41 [48]) before he could ever reach the merits. It is only since 1974 when this court decided that Senator Kennedy had standing as a Senator to sue to overturn a Pocket Veto, that Congressmen have had much assurance that their standing as Congressmen might be recognized in a court of law against the President. *Kennedy v. Sampson*, 167 U.S. App.D.C. 192, 511 F.2d 430 (D.C. Cir. 1974). Cf., *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). In this light, the 13 instances that the President cites are merely situations when Congressmen had little or no incentive, or means, to oppose the President's action, and little or no assurance that a court would ever reach the merits of their objections.

### D. Summary of the President's 13 Alleged Instances of Unilateral Treaty Terminations.

To summarize the 13 instances in which the appellant asserts that Presidents acted *alone* to such an extent that the courts should recognize that the President now has absolute power *alone* to terminate the Taiwan Treaty, the North Atlantic Treaty, the SALT Treaty, the Japanese Security Treaty and other treaties of similar magnitude: In five instances Congress by direct authorization, or inconsistent legislation supplied the basis for the President's action; [49] in two instances the putative abrogation was withdrawn and no termination resulted; [50] one treaty was already terminated by the demise of the country; [51] one treaty had become void by a change in the basic facts upon which the treaty was grounded; [52] four treaties had already been abrogated by the other party [53]; and of the two that were non-functioning the Trademark Treaty was *not* terminated. [54] See B.(9) *supra*.

In almost 200 years of American history these are the *only* instances that appellant has been able to dredge up in an effort to support his claim to absolute power. Analysis of such instances, however, does not support appellant's contentions. [55] *It is al-*

---

**48.** The brief of the Department of Justice, page i, in support of the President's action, attacks the right of Members of Congress to bring this action, and lists, *inter alia*, the following points:

I. PLAINTIFFS' CHALLENGE TO THE PRESIDENT'S AUTHORITY TO TERMINATE THE MUTUAL DEFENSE TREATY PRESENTS A NON-JUSTICIABLE POLITICAL QUESTION --------- 18

II. PLAINTIFFS LACK STANDING TO MAINTAIN THIS ACTION -------------------------------- 29

 A. Plaintiffs Have Not Met Basic Constitutional Requirements. ------------------------ 29

 1. The Alleged Injury to the Constitutional Allocation of Power. ----------------- 30

 2. The Alleged Injury to Voting Opportunities. 31

 B. Prudential Considerations Strongly Militate Against Holding That Plaintiffs Have Standing To Maintain This Action. ------------- 39

**49.** (2) Switzerland, (3) Belgian Congo, (4) authorized by National Recovery, (7) Italy Act (NRA); (12) Cuba.

**50.** (6) Greece, (13) Warsaw Convention.

**51.** (1) Netherlands.

**52.** (10) Nomenclature.

**53.** (6) Greece, (7) Italy, (8) Japan (2 treaties), (11) Cape Spartel.

**54.** (4) Mexico smuggling, (9) Inter-American Trademark.

**55.** Such claims as the President's here, based upon nearly nonexistent and readily distinguishable precedent, have been rejected before. *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 648, 72 S.Ct. 863, 877, 96 L.Ed. 1153 (Jackson, J., Concurring):

 The Solicitor General, acknowledging that Congress has never authorized the seizure here, says practice of prior Presidents has authorized it. He seeks color of legality from

*most farcical for appellant to contend that the President, acting alone, has absolute power to terminate a major United States defense treaty, and by the same token hereafter any defense treaty, because a few earlier Presidents withdrew financial support of a treaty bureau because of non-filing of trademarks by El Salvador, Honduras, Paraguay, et al., and terminated several violated treaties, or terminated treaties relating to a light house museum in Morocco, nomenclature in economic reports, smuggling with a country with whom we had no commercial treaty, or with respect to which notices of termination had been given and then withdrawn.* On examination it appears that among the 13 instances upon which the President relies, there were only two minor treaties in which the President could be said to have acted alone since 1788. Reliance upon such miniscule precedent forcibly illustrates the great weakness in the President's claim to *absolute power* in the present circumstances involving a Defense Treaty.

Also, practically all of the 13 instances upon which the President relies were of such minor impact, or so non-controversial and widely approved that no person would have suspected that such instances would later be claimed as precedents to support an *absolute* Presidential unilateral power to terminate major defense treaties. An evolution of such great power from so little was never broached or envisioned. Thus does even minor usurpation gnaw away at constitutional rights. Fortunately, however, the imprimatur of law is not lightly awarded. Even the enactment of many statutes and lengthy acquiescence by Congress and the President in constitutional infractions will not support a non-existent power or unwarranted constitutional construction. *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892); *James v. U. S.,* 202 U.S. 401, 26 S.Ct. 685, 50 L.Ed. 1079

(1903); *U. S. v. Boyer,* 85 F. 425 (D.C.Mo. 1898). Usurpation does not make constitutional that which is unconstitutional.

## IV Foreign Affairs within the Constitutional Scheme

### A. The Curtiss-Wright Case.

The President asks this court to provide him with *absolute power to terminate all treaty obligations of the United States.* This claim of absolute Presidential power is of the same breadth as the power to seize the steel mills that President Truman claimed and was denied in *Youngstown Steel & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). President Carter argues that this unchecked power is a necessary incident of his power to recognize foreign governments, and is consistent with the panoply of foreign affairs powers that the Supreme Court in *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) held that he was authorized to exercise. Although the President as our national actor on the world stage plays the lead, Congress too, has been cast by the Constitution in an important role. Neither the *Curtiss-Wright* decision nor the President's constitutional authority in foreign affairs should be construed to infringe upon Congress' exercise of its constitutional right to exercise "all legislative powers . . . granted" by the Constitution,[56] or allowed to undermine our constitutional scheme of checks and balances.

In *United States v. Curtiss-Wright, supra,* Mr. Justice Sutherland outlined our expansive national powers in the field of foreign affairs, and found the President to be the principal repository of these powers. The gist of his constitutional and historical construction was that the enumerated powers were those taken from the states, the states never possessed international powers, therefore sources of international power

claimed executive precedents, chief of which is President Roosevelt's seizure on June 9, 1941, of the California plant of the North American Aviation Company. Its superficial similarities with the present case, upon analysis, yield to distinctions so decisive that it

cannot be regarded as even a precedent, much less an authority for the present seizure.

**56.** U.S. Constitution, Article I, Section 1.

need not be directly enumerated in the Constitution.[57]

Justice Sutherland dubbed the President the "sole organ of the federal government in the field of international relations". He is our spokesman in foreign affairs, but his power "must be exercised in subordination to the applicable provisions of the Constitution,"[58] and our laws and treaties. Commentators in the years since the *Curtiss-Wright* decision, considering on one hand the decision's expansion of Presidential international power, and on the other, the powers over foreign affairs vested by the Constitution in Congress, have puzzled over appropriate apportionment of international powers among the two branches. Professor Henkin, for example, remarks:

> [W]e are not told how the undifferentiated bundle of powers inherent in sovereignty is distributed among the federal branches. It seems to have been assumed that they are distributed "naturally", those that are "legislative in character" to the Congress,[59] those "executive" to the President. . . .

In *Perez v. Brown*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), Mr. Justice Frankfurter speaking for the court recognized that certain powers "legislative in character", although not specifically delegated to Congress by the Constitution, were nonetheless within the constitutional power that Congress possessed over our foreign affairs. Accordingly, upholding the constitutionality of §§ 401(e) and (j) of the Nationality Act of 1940, in which Congress provided that United States citizenship would be lost by citizens voting in elections in a foreign state, the court found the statute to be a valid regulation of foreign affairs by Congress.[60]

> [W]hat is the source of power on which Congress must be assumed to have drawn? Although there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, *there can be no doubt of the existence of this power in the law-making organ of the Nation.*

356 U.S. at 57, 78 S.Ct. at 575.[61] (Emphasis added).

Hence, whatever expansion the *Curtiss-Wright* decision occasioned in the President's power in foreign affairs, that expansion has its limitations. The decision cannot be read to trample upon the history of treaty termination, which is based on the original understanding that termination would be a power shared by the branches, nor can it undermine the fact that the Constitution provides that the "Constitution, and the laws . . . and all Treaties . . . shall be the supreme *Law* of the Land."[62]

The President's authority in foreign affairs is that of head of state. Through his office the actual contacts involved in international relations are carried out. But this power, as Justice Sutherland stated in *Curtiss-Wright,* "must be exercised in subordination to the applicable provisions of the Constitution". 299 U.S. at 320, 57 S.Ct. at 221. Hence, when in the conduct of foreign affairs, a legislative function is implicated, the President's power must be accommodated to a congressional exercise of power. The negotiation of treaties, being an executive function by the Constitution, is within the presidential prerogative, subject to Senate approval, or possible amendment. So

---

57. 299 U.S. at 315–18, 57 S.Ct. 216.

58. *Id.* at 319–20, 57 S.Ct. at 221.

59. L. Henkin, *Foreign Affairs and the Constitution* 27 (1972).

60. *Perez* was overruled by *Afroyim v. Rusk,* 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1966). Although the Court rejected "the idea expressed in *Perez* that . . . Congress has any general power, express or implied, to take away an American citizen's citizenship without

his assent," (at 257, 87 S.Ct. at 1662) and found the statute invalid, the Court did not criticize Justice Frankfurter's exposition in *Perez* of an implied general power to regulate foreign affairs.

61. *See generally* W. Lockhart, Y. Kamisar, and J. Choper, *Constitutional Law: Cases—Comments—Questions* 289 (4th ed. 1975).

62. U.S. Constitution, Article VI.

too, the negotiation to end treaties, if negotiations there be, may be a presidential function. Yet when the negotiations, or other determinations, lead to a presidential decision to terminate a treaty, a law is necessary and thus the next required step is legislative. As law of the land, a treaty must be repealed by *Congress* as the body charged by our Constitution with the legislative function.

The majority states that the President's status as our "sole organ" in foreign affairs is "not confined to service as a channel of communication," but neither is his status enlarged to that of "absolute power." In the conduct of foreign affairs, as in the exercise of all his other powers, the Constitution requires of the President: "He shall take Care that the *Laws* be faithfully executed." Article II, Sec. 3. So to the extent that a *law* governs our foreign affairs, the President does act as a "channel of communication"—as our spokesman of a law such as Congress might make to terminate a treaty—but in other respects he does possess very substantial powers in the foreign field.

### B. *The Recognition of Foreign Governments.*

The President maintains that it would be an interference with his power to "receive Ambassadors and other public Ministers" [63] were he not given the absolute right, *alone*, to terminate the Mutual Defense Treaty with Taiwan without any advice or consent of the Senate or any congressional action. Had the Republic of China (Taiwan) violated the treaty he might have the same right to give notice of the termination of abrogated treaties that other presidents have exercised, but Taiwan has not violated our treaty in any respect.

The President argues that the termination was necessary to his recognition of the People's Republic of China. In making that argument, the President, in effect, asks the courts of this nation to choose between upholding his right to recognize foreign governments and Congress' right to approve the termination of United States' treaties.

I am not persuaded that the court need view these distinctly separate Constitutional powers as necessarily bound together, nor need we elevate one power over the other. As the termination of a treaty is an independent legislative act under our Constitution, termination requires an independent legislative exercise. To the extent that Congress thereby becomes involved in the conduct of foreign relations, it does so in a strictly legislative sense, its approval being required for the repeal of any law.

The President's objective can be achieved merely by inviting Congress to pass a Joint Resolution authorizing the termination of the Taiwan Treaty. Or he can receive the Ambassador from the Peoples Republic of China without the treaty being terminated. There is nothing inherent in the President's constitutional power to receive the Ambassador from the People's Republic that compels terminating the Taiwan Treaty. What creates the complication that bothers the President is that there are *actually* two Chinas. The President wants to act in some respects as though there is only one China and in other respects, as indicated by the Taiwan Relations Act,[64] as though there are two. This attempt to carry water on both shoulders is the basic cause of the President's problem and he asks this court to distort the Constitution to accomplish his objective without Congressional approval. He should not look to the courts to distort or violate the Constitution in an effort to avoid his obligation to secure congressional action on the suggested termination as the Constitution requires.

The linchpin in the President's argument, and it is completely fallacious, is that he must be recognized as having the power, acting alone, to terminate the treaty because the position of the Mainland Chinese Government was that "termination of the Defense Treaty with Taiwan was a prereq-

---

**63.** U.S. Constitution, Article II, Section 3.

**64.** Pub.L. 96–8, 93 Stat. 14 (April 10, 1979).

uisite to [normalization]" of relations between that government and the United States (Appellant's Br. 6–7). But it is a logical *non sequitur* to conclude from the premise that because the *People's Republic* requires termination of the Taiwan Treaty that therefore the President must be recognized under our Constitution as having the *absolute power alone* to terminate that treaty. Such a conclusion is completely unjustified by the premise.

This is not the first time that the supporters of Presidential power have relied upon an invisible premise of expediency. Upholding the President's claimed power might be felt by some to be expedient in these circumstances. Justice Jackson, however, concurring in *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 592, 72 S.Ct. 863, 869, 96 L.Ed. 1153, appreciated the hazards of taking an historically myopic view of the balance of power among the branches of government:

> The opinions of judges, no less than executives and publicists, often suffer the infirmity of confusing the issue of a power's validity with the cause it is invoked to promote, of confounding the permanent executive office with its temporary occupant. The tendency is strong to emphasize transient results upon policies—such as wages or stabilization—and lose sight of enduring consequences upon the balanced power structure of our Republic.

The only pertinent question is what procedure the *Constitution* requires for termination; what the *PRC* demands is irrelevant. If the Constitution requires congressional action, as has been the prevailing practice, that is the end of the matter. We should not offend the lasting value of our constitutional scheme in the pursuit of momentary political ascendancy.

C. *The Termination Provision of the Treaty.*

In several places the majority opinion makes an argument that is essentially based on a play on words and has no legal validity. An example of this is the statement that "notice of termination [was] given by the President *pursuant to the terms of the Mutual Defense Treaty . . . .*" This is designed to give the impression that the Treaty provides that "the *President*" is specifically authorized to give the "notice of termination". Such is *not* the fact. The Treaty provision provides:

> Article X: This Treaty shall remain in force indefinitely. Either *Party* may terminate one year after notice has been given to the other *Party*.

TIAS 3178. (Emphasis added)

Clearly the *parties* referred to are "the United States of America and the Republic of China". The United States of America, not the President, is treaty-bound to give "mutual aid . . . and develop their individual and collective capacity to resist armed attack . . ." etc. *Id.* Thus the President is *not* named *in* the Treaty to give notice of termination, as the majority opinion infers, without exactly saying so. The sole issue in this case is who can act for the United States; that issue is not determined by the Treaty but by the Constitution of the United States.

The deceptive misstatement quoted above, which implicitly assumes the principal issue here to be decided, is repeated four times in the majority opinion at page ——, footnote 2 of —— U.S.App.D.C., at page 699, footnote 2 of 617 F.2d; and pages ——, —— and —— of 199 U.S.App.D.C., pages 700, 704 and 706 of 617 F.2d. This argument posing as a statement of fact operates like a smokescreen and if repeated often enough seems to acquire validity. This is unwarranted and deceptive, for it has absolutely no legal validity, hence stands out as another indication of the paucity of legitimate support for the majority decision.

D. *Treaties and Presidential Appointments Confirmed by the Senate.*

The majority adopts a Presidential argument and states that if Senate approval were held to be necessary to terminate a treaty then identical approval would be necessary to terminate Ambassadors. The majority's reasoning is that Ambassadors are required to be confirmed by the Senate, and

they are appointed "under the same clause" as the treaty power. That this point is made in a serious vein is unbelievable and illustrates lack of depth of analysis. The reason some would require Senate approval for treaty termination (and I would require approval by *Congress*) is not because treaties are ratified by the Senate but because, under Article VI of the Constitution, treaties, together with the Constitution and United States statutes, are made the "supreme *Law* of the Land." Subsequent legislative power over such laws is in Congress as the legislative body, hence, as "laws", legislation is necessary to repeal or terminate them.

For presidentially appointed ambassadors who are confirmed by the Senate, however, there is no similar constitutional provision adding anything to their appointment and ambassadors acquire only such right to tenure as they are given by the statute that governs their office. Most presidential appointments have nothing equivalent to the Supremacy Clause to add permanency to their office. The Constitution, however, provides that the tenure of some officials is during good behavior and they cannot be removed except by impeachment. Art. II, Sec. 4; Art. III., Sec. 1. The Constitution does not place ambassadors in that category. The Framers knew how to provide for Senate removal of ambassadors had they so intended. It is thus apparent that treaties and ambassadors are treated differently by the Constitution. That the suggested absurd construction is attempted indicates the dearth of legal support for the President's claim.

E. *Checks and Balances in Foreign Affairs.*

Finally, this case dramatizes the necessity for contemporary reaffirmation of the Framers' wisdom in designing our constitutional system of checks and balances. Without a congressional check on the President's power to sever our treaty obligations, the President would possess a very dangerous power in some instances to affect our substantive international commitments.[65] Presidents change, and courts should be mindful of that fact.

Termination provisions similar to that in the Mutual Defense Treaty with Taiwan can be found in the North Atlantic Treaty (NATO) of April 4, 1949, 4 Bevans 828, the Security Treaty with Japan of January 19, 1960, 11 U.S.T. 1632, the Nuclear Nonproliferation Treaty, 21 U.S.T. 493, the Biological Weapons Convention, 26 U.S.T. 591, and the Outer Space Treaty, 18 U.S.T. 2420. Is the sole power to terminate these treaties vested in the President? Can a President, acting alone, terminate the SALT Treaty or the Migratory Bird Treaty? No prior President has ever claimed such power with respect to such important treaties; we should not allow the few prior instances where Presidents, in relatively minor matters, may have acted alone to be magnified into a truly awesome power and a dangerous precedent.

If the President has absolute power to terminate the Mutual Defense Treaty with Taiwan he likewise has absolute power under similar circumstances to terminate the NATO Treaty, our Japanese Security Treaty, the SALT Treaty and any other Defense Treaty that the Senate might have concurred in by a two-thirds vote. But when the Constitution explicitly requires the vote of two-thirds of the Senators present to ratify a treaty already fully negotiated by the President, a contention that the same Constitution would vest *absolute power* in one official to terminate that treaty is clearly contrary to the constitutional design.

---

**65.** Former Undersecretary of State Eugene Rostow declared:

"It cannot be constitutional to allow the President to abrogate treaties by a stroke of his pen. Can the President alone nullify our solemn national commitment to NATO? The President's duty is to see that treaties and statutes are 'faithfully executed.' He has no power to repeal them. Such a doctrine would make nonsense of the separation of powers, and indeed establish an Imperial Presidency."

125 *Cong.Rec.*, S.7047 (daily ed. June 6, 1979).

Maintenance of a constitutional balance in treaty termination assumes even greater importance as our nation becomes increasingly oriented toward global affairs. The practicalities of power, and abuse of power, present persuasive arguments for retention of the practice of sharing the treaty termination power. Distance from the days of the Framers of the Constitution should not sever us from their constitutional scheme of checks and balances, any more than it can overcome the logic inherent in the magnificent document they bequeathed to us.

## V Conclusion

As modern communications, transportation, and military power increasingly bring the perils and problems of the entire globe into our daily consciousness, our national concerns become international. Foreign affairs become our national affairs. Hence, to the extent that we complacently grant to the President unbridled power in the international realm, we increase his power nationally, to an ever expanding degree.

An accurate summary of the potential consequences of *absolute power* that the majority opinion would place in the Presi-

dent is set forth in a current article in 19 Harvard International Law Journal 931, 1008 (1978), by D. Scheffer:

> If the President's unilateral action were to go unchecked, then the precedent which this case would establish could lead to the inevitable consequence of an ambitious or unreasoned President disengaging the United States from crucial bilateral and multilateral treaties with the stroke of a pen and without the constitutional balance of legislative advice and consent.

The appetite of the presidential office will be whetted by the court's decision today. In future years, a voracious President and Department of State may easily use this grant of *absolute power* to the President to develop other excuses to feed upon congressional prerogatives that a Congress lacking in vigilance allows to lapse into desuetude.

I would instead preserve the congressional function of treaty termination, recognizing that exercise of this power requires a majority vote of Congress and the approval of the President.[66] Accordingly, I respect-

---

**66.** The following discussion relates to two points raised in Chief Judge Wright's opinion:

A. *The Dole-Stone Amendment.* In the International Security Assistance Act of 1978 the Congress incorporated as Section 26(b) the following provision, which is known as the Dole-Stone Amendment:

> It is the sense of the Congress that there should be prior consultation between the Congress and the executive branch of any proposed policy changes affecting the continuation in force of the Mutual Defense Treaty of 1954.

P.L. 95–384, 92 Stat. 746 (1978). Appellant's brief contends that since the "Congress sought only consultation and did not ask to vote on termination of the treaty", the constitutional processes need not be followed in terminating the treaty. Appellant's Brief 9. That is a specious argument. The fact that the Dole-Stone Amendment calls only for "prior consultation" does not mean that if the outcome of that consultation were general agreement with the termination of a treaty that it would not be necessary to terminate the treaty in the constitutional manner. Even Congress cannot permanently waive constitutional rights designed to protect the public, and it did not do so in the Dole-Stone Amendment.

B. *The Resolution of Senator Harry F. Byrd, Jr. with Respect to Termination of Mutual Defense Treaties.* The record reflects that on January 18, 1979, and again on March 7, 1979, Senator Harry F. Byrd, Jr. of Virginia submitted a resolution to the Senate that provided:

> *Resolved,* that it is the sense of the Senate that approval of the United States Senate is required to terminate any mutual defense treaty between the United States and any other nation.

S.Res. 15, 96th Cong., 1st Sess., 125 *Cong.Rec.* S.220, S.2147, January 18, March 7, 1979. This resolution was referred to the Committee on Foreign Relations which substituted antagonistic language and reported it back as S.Res. 15. S.Rep.No. 96–119, 96th Cong., 1st Sess. 1–19–79. The substitute language provided:

> *Resolved,* That it is the sense of the Senate that treaties or treaty provisions to which the United States is a party should not be terminated or suspended by the President without the concurrence of the Congress except where—
>
> (1) the treaty provisions in question have been superseded by a subsequent, inconsistent statute or treaty; or
>
> (2) material breach, changed circumstances, or other factors recognized by international law, or provisions of the treaty itself,

fully dissent and would affirm the decision of the District Court to the extent that it requires an act of Congress and approval thereto by the President. It is erroneous for the majority opinion to assert that my "position . . . requires a reversal of the District Court."

give rise to a right of termination or suspension on the part of the United States;

The substitute was an obvious attempt to subvert the purpose of Senator Byrd's resolution. It would have effectively silenced the Senate's voice in the termination of practically any treaty because most treaties provide for a "right of termination or suspension on the part of the United States." The Senate understood this, so in a June 6th floor contest between the Byrd resolution and the substitute resolution, the Byrd resolution was adopted by the Senate 59–35. Since that date, however, the Senate leadership has prevented the amended S.Res. 15 from coming to a final vote (App. 660). Thus, while the situation remains unresolved, the Senate's most recent expression overwhelmingly (59 to 35) interpreted the Constitution to require the approval of the United States Senate to termination of "any mutual defense treaty between the United States and another nation."